# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MASSACHUSSETTS

PETER BLAKESLEE, Individually and on behalf of all others similarly situated,

        Plaintiff,

    v.

PHC, INC., BRUCE A. SHEAR, DONALD E. ROBAR, DOUGLAS J. SMITH, HOWARD W. PHILLIPS, WILLIAM F. GRIECO, DAVID E. DANGERFIELD, ACADIA HEALTHCARE COMPANY, INC., and ACADIA MERGER SUB, LLC,

        Defendants.

Civil Action No. 1:11-cv-11049-GAO

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ……………………………………………………………… ii

I.   INTRODUCTION………………………………………………………………… 1

II.  ARGUMENT……………………………………………………………………….. 4

    A.   Plaintiff Alleges Valid §14(a) Claims ……………………………………… 4

        1.   Standards Applicable to Plaintiff's §14(a) Claims  ……………... 4

        2.   A Direct Claim for Violation of §14(a) Requires No Demand ….. 5

        3.   The Proxy Fails to Disclose All Material Information ………….. 6

            a.   Defendants Failed to Fully and Fairly Disclose Material Information Concerning the Sales Process for PHC …….. 7

            b.   Defendants Failed to Fully and Fairly Disclose Material Information Concerning the Fairness Opinion…………… 9

            c.   Defendants Failed to Fully and Fairly Disclose Material Information About Conflicts of Interest with the Company's Financial Advisor  ………………………… 14

    B.   The Complaint Alleges Valid Claims for Breach of Fiduciary Duty …… 14

        1.   The Claims Are Properly Pled as Direct   ……………………….. 15

        2.   The Business Judgment Rule Does Not Protect Defendants ……. 16

        3.   Defendants Cannot Meet Their Burden of Proving the Merger Was Fair and for a Legitimate Business Purpose  ……………… 17

    C.   Plaintiff Is Entitled to Remedies Besides Appraisal  …………………… 19

    D.   The Complaint Alleges Valid Claims for Aiding and Abetting   ……….. 19

III. CONCLUSION  ………………………………………………………………… 20

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Basic v. Levinson*, 485 U.S. 224 (1988) ..............................................................8

*Black v. Cincinnati Finance Corp.*, No. 1:11-cv-210, 2011 U.S. Dist. LEXIS 46852 (S.D. Oh. May 2, 2011) ..............................................................3, 6

*Blau v. Harrison*, No. 04 C 6592, 2006 U.S. Dist. LEXIS 19795 (N.D. Ill. Mar. 24, 2006) ......................................................................................................8

*In re CNET Networks, Inc.*, 483 F. Supp. 2d 947 (N.D. Cal. 2007) ...................6

*CSX Corp. v. Children's Investment Fund Management (UK) LLP*, 562 F. Supp. 2d 511 (S.D.N.Y. 2008) .................................................................................5

*Calamore v. Juniper Networks, Inc.,* No. C 07-01772 JW, 2008 U.S. Dist. LEXIS 111356 (N.D. Cal. Aug. 12, 2008) ....................................................3,6

*In re Columbia Entities Litigation*, No. 04-11704-REK, 2005 U.S. Dist. LEXIS 33439 (D. Mass. Nov. 30, 2005) .........................................................6

*In re Computer Sciences Corp. Derivative Litigation,* No. CV 06-05288 MRP, 2007 U.S. Dist. LEXIS 25414 (C.D. Cal. Mar. 26, 2007) ...........................6

*Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438 (D. Md. 1996) .....................5

*Giragosian v. Bettencourt*, 614 F.3d 25 (1st Cir. 2010) ....................................20

*Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F. Supp. 1260 (S.D. Fla. 1995) ....................................................................................................5

*J. I. Case Co. v. Borak*, 377 U.S. 426 (1964) .....................................................5

*J & J Sports Products v. Carvajal*, 2011 U.S. Dist. LEXIS 109542 (D. Mass. Sept. 26, 2011) ...............................................................................................20

*Kaplan v. First Hartford Corp.*, 447 F. Supp. 2d 3 (D. Mass. 2006) .................5

*Kas v. Finance General Bankshares, Inc.*, 796 F.2d 508 (D.C. Cir. 1986) .......14

*Lewis v. Graves*, 701 F.2d 245 (2d Cir. 1983) ....................................................6

*Liston v. Gottsegen*, 348 F.3d 294 (1st Cir. 2003) ..............................................4

*Lockspeiser v. Western Maryland Co.*, 768 F.2d 558 (4th Cir. 1985) ...............................12

*Matrixx Initiatives v. Siracusano*, 131 S. Ct. 1309 (2011) ....................................................7

*Mills v. Electric Automobile-Lite Co.*, 396 U.S. 375 (1970) ......................................2, 5, 6

*New Jersey v. Sprint Corp.*, No. 03-207 (JWL), 2010 U.S. Dist. LEXIS 134003
(D. Kan. Dec. 17, 2010) .............................................................................................5

*In re PHLCORP Securities Tender Offer Litigation*, 700 F. Supp. 1265 (S.D.N.Y.
1988) ........................................................................................................................12

*Radol v. Thomas*, 556 F. Supp. 586 (S.D. Ohio 1983) ........................................................12

*In re Real Estate Associates Ltd. Partnership Litigation*, 223 F. Supp. 2d 1142
(C.D. Cal. 2002) ......................................................................................................12

*Royal Business Group, Inc. v. Realist, Inc.*, 933 F.2d 1056 (1st Cir. 1991) .......................5

*Strategic Turnaround Equity Partners, L.P. v. Fife*, No. 10-CV-11305 (SJM),
2010 U.S. Dist. LEXIS 63629 (E.D. Mich. June 28, 2010) ...................................5

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) .........................................6, 7

*Texas Partners v. Conrock Co.*, 685 F.2d 1116 (9th Cir. 1982) ....................................8, 12

*In re Time Warner Sec. Litigation*, 9 F.3d 259 (2d Cir. 1993) .......................................8, 9

### STATE CASES

*Alidina v. Internet.com Corp.*, No. 17235-NC, 2002 Del. Ch. LEXIS 156 (Del.
Ch. Nov. 6, 2002) ....................................................................................................12

*Globis Partners, L.P. v. Plumtree Software, Inc.*, C.A. Number 1577-VCP, 2007
Del. Ch. LEXIS 169 (Del. Ch. Nov. 30, 2007) .............................................14

*In re CheckFree Corp. Shareholders Litigation*, 2007 Del. Ch. LEXIS 148 (Del.
Ch. Nov. 1, 2007) ....................................................................................................14

*Coggins v. New England Patriots Football Club*, 397 Mass. 525 (1986) ..............4, 17, 18

*Donahue v. Rodd Electrotype Co. of New England*, 328 N.E.2d 505 (Mass. 1975) .....4, 16

*Gent v. Teradyne, Inc.,* 2010 Mass. Super. LEXIS 305 (Mass. Super. Ct. 2010) .............15

*Gesoff v. IIC Industrial, Inc.*, 902 A.2d 1130 (Del. Ch. 2006) ..........................................15

*Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104 (Del. Ch. 2007) ..........17

*Gut v. MacDonough*, No. WOCV-2007-01083-C, 2007 Mass. Super. LEXIS 382
    (Mass. Super. Ct. 2007) ......................................................................4, 15, 17, 18

*Horton v. Benjamin*, No. 92-06697, 1997 Mass. Super. LEXIS 85 (Mass. Super.
    Ct. 1997) ....................................................................................4, 17, 18, 19

*Instrument Industries Trust v. Danaher Corp.*, 2005 Mass. Super. LEXIS 575
    (Mass. Super. Ct. 2005) .......................................................................15

*In re JCC Holding Co., Inc. Shareholder Litigation*, 843 A.2d 713 (Del. Ch.
    2003) ...........................................................................................12

*La. Municipal Police Employees' Retirement System v. Crawford*, 918 A.2d 1172
    (Del. Ch. 2007) ...............................................................................15

*In re Lear Corp. Shareholder Litigation,* 926 A.2d 94 (Del. Ch. 2007)..........................14

*In re Netsmart Technologies, Inc. Shareholders Litigation*, 924 A.2d 171 (Del.
    Ch. 2007)..................................................................................9, 12, 13

*In re Pure Resource Shareholders Litigation*, 808 A.2d 421 (Del. Ch. 2002) ...........12, 13

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986)...........15

*Sarin v. Ochsner*, 721 N.E.2d 932 (Mass. App. Ct. 2000) ................................................15

*Skeen v. Jo-Ann Stores, Inc.,* 750 A.2d 1170 (Del. 2000) ..................................................13

*Smyth v. Field,* No. 91-7803-F, 1993 Mass. Super. LEXIS 231 (Mass. Super. Ct.
    1993) .............................................................................................6

*In re Tele-Communications, Inc., Shareholders Litigation*, C.A. No. 16470, 2005
    Del. Ch. LEXIS 206 (Del. Ch. Dec. 21, 2005) ..........................................................14

*Zirn v. VLI Corp.*, 681 A.2d 1050 (Del. 1996) ..................................................................9

*Zirn v. VLI Corp.*, 621 A.2d 773 (Del. 1993) ....................................................................7

## FEDERAL STATUTES

17 C.F.R. § 240.14a-9 ...........................................................................................5

**STATE STATUTES**

Mass. Gen. Laws ch. 156D, §13 ........................................................................................20

## I.   INTRODUCTION

It cannot be disputed that the Board of Directors of PHC, Inc. d/b/a PHC Behavioral Health ("PHC" or "Company") have struck a deal with Acadia Healthcare Company, Inc. ("Acadia") that includes favorable treatment in terms of windfall compensation, which is not otherwise available to PHC's public stockholders. As a result, the Board has violated its fiduciary duties to shareholders by engaging in an inadequate sales process and asking shareholders to approve a transaction that entitles PHC shareholders to receive 0.25 shares of Acadia common stock ("Proposed Transaction"), leaving PHC stockholders with only 22.5% of the combined company, while Acadia stockholders will own approximately 77.5%.

Defendants have withheld from PHC shareholders vital and material information they need to know before deciding how to vote. Indeed, what has been made available to PHC shareholders prior to the vote on the Proposed Transaction does not include adequate information concerning, among other things: (a) the sales process for the Company; (b) the data and inputs underlying the financial valuation exercises that purport to support the so-called "fairness opinion" provided by PHC's financial advisor, Stout Risius Ross, Inc. ("SRR"); and (c) details concerning SRR's potential conflict of interest, including how much compensation it has received from PHC in connection with its "fairness opinion."

Section 14(a) of the Securities Exchange Act of 1934 ("1934 Act") and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder (collectively "§14(a)") expressly remedy defendants' failure to provide PHC shareholders fully and fairly with all material information in connection with the Proposed Transaction. As alleged in Plaintiff's Amended Class Action Complaint ("Complaint"),[1] the Proposed Transaction is plagued with violations of §14(a), as defendants issued a false and misleading preliminary proxy statement

---

[1] Citations herein to the Complaint are in the form: ¶__.

1

("Proxy") on July 13, 2011, and they have failed to correct the Proxy for shareholders to be adequately informed before the shareholder vote. These allegations easily meet the pleading standard for §14(a) claims, which requires only that Plaintiff allege: (1) that the Proxy contained a false or misleading statement of material fact or omission; (2) that the misstatement or omission of a material fact was the result of no more than negligent conduct; and (3) that the Proxy was an "essential link" in the accomplishment of the transaction that caused Plaintiff's injuries. *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384-85 (1970).

In addition, each of the defendants breached and/or aided the other defendants' breaches of their fiduciary duties.[2] For example, Acadia bought the support of the Board (including CEO and Chairman Bruce Shear) by agreeing to pay them (as holders of approximately 93% of PHC's Class B Common Stock) $5 million in cash in exchange for voting agreements whereby they have irrevocably agreed to vote in favor of the Proposed Transaction. ¶¶25-27, 51, 59, 65. Moreover, all of the outstanding stock options and all of the outstanding warrants to purchase PHC's common stock will be assumed by Acadia in connection with the Proposed Transaction; Class A shareholders will not receive this benefit. ¶¶41-43. There will also be a $90 million cash dividend paid to the holders of Acadia prior to the Merger, which PHC's common shareholders will not enjoy, although they will be saddled with the debt for this dividend to the extent it will be financed as part of the Merger. ¶¶25, 51-53.

Defendants have moved to dismiss the Complaint, but their motion suffers from at least three related flaws.[3]

---

[2] While Plaintiff's amended Complaint mooted Defendants' previous motion to dismiss (insofar as the motion only related to common law breach of fiduciary duty claims), Plaintiff continues to maintain those common law claims on a class basis in view of the fact that the Court has not yet ruled on the competing motions for lead counsel.

[3] Plaintiff also incorporates herein the arguments set forth by plaintiff Maz Partners in opposition to defendants' motions to dismiss.

First, even though Plaintiff's amended Complaint mooted their previous motion to dismiss, Defendants persist in arguing that Plaintiff's claims should have been brought derivatively – even though Plaintiff is clearly pursuing direct federal securities claims under §14(a). In fact, defendants contend that *all* §14(a) claims are subject to a demand requirement. However, it is well established that violations of §14(a) can be either direct or derivative. And while certain §14(a) claims that are in fact brought derivatively, seeking damages on behalf of a company, may be subject to a demand requirement, direct §14(a) claims are not. *See, e.g., Black v. Cincinnati Fin. Corp.,* No. 1:11-cv-210, 2011 U.S. Dist. LEXIS 46852, at *6-14 (S.D. Oh. May 2, 2011). The Complaint alleges that "Plaintiff will be deprived of his right to make a fully informed decision" concerning the merger vote if the misrepresentations and omissions in the Proxy are not corrected. ¶92. Under Massachusetts and Delaware law alike, "such deprivation is an individual harm." *Calamore v. Juniper Networks, Inc.*, No. C 07-01772 JW, 2008 U.S. Dist. LEXIS 111356, *10 (N.D. Cal. Aug. 12, 2008). Accordingly, Plaintiff's §14(a) claim is properly pled as direct, and no demand upon PHC is required.

Second, Defendants err by conflating derivative and direct claims for breach of fiduciary duty. They object that Plaintiff pleads no special injury distinct from the harm suffered by all shareholders. But the Complaint alleges Defendants have abused their control of PHC to secure a $5 million cash premium for holders of PHC Class B shares, while diluting PHC Class A shares held by the likes of Plaintiff, who will become minority shareholders of the newly combined company post-Merger. In that regard, this case resembles disputes where controlling stockholders in a close corporation "freeze out" minority stockholders by denying them equal purchase rights, giving rise to a direct claim for breach of fiduciary duty. *Donahue v. Rodd Electrotype Co. of New England*, 328 N.E.2d 505, 519 and n.25 (Mass. 1975); *Liston v.*

3

*Gottsegen*, 348 F.3d 294, 301 n.10 (1st Cir. Mass. 2003); *Horton v. Benjamin*, No. 92-06697, 1997 Mass. Super. LEXIS 85, *64 (Mass. Super. Ct. 1997).

Third, Defendants err by assuming the business judgment rule applies to their misconduct concerning the Merger. Under Massachusetts law, "some transactions involve a higher risk of abuse of fiduciary duty and warrant higher judicial scrutiny." *Gut v. MacDonough*, No. WOCV-2007-01083-C, 2007 Mass. Super. LEXIS 382, *37 (Mass. Super. Ct. 2007) (citing *Coggins v. New England Patriots Football Club*, 397 Mass. 525, 533 (1986)). A "controlling stockholder who is also a director standing on both sides of the transaction bears the burden of showing that the transaction does not violate fiduciary obligations." *Coggins*, 397 Mass. at 533; *Gut*, 2007 Mass. Super. LEXIS 382, at *37; *Horton*, 1997 Mass. Super. LEXIS 85, *68 In this case, Defendant Shear has abused his control of the PHC to secure a $5 million cash premium for Class B shares (93.2% of which he owns) at the expense of Class A shareholders. ¶¶ 2, 27-28, 95. Given these risks of self dealing and dilution of Class A shares, "a judge should examine with closest scrutiny the motives and behavior of the controlling stockholder." *Coggins*, 397 Mass. at 533; *Gut*, 2007 Mass. Super. LEXIS 382, at *37; *Horton*, 1997 Mass. Super. LEXIS 85, at *68.

In sum, Plaintiff has set forth well-pleaded allegations that are sufficient to state claims for violation of federal and state law. That is all that is necessary to defeat a Rule 12(b)(6) motion. Thus Defendants' motion must be denied.

## II.   ARGUMENT

### A.   Plaintiff Alleges Valid §14(a) Claims

#### 1.   Standards Applicable to Plaintiff's §14(a) Claims

It is well established that shareholders "alleging a violation of the proxy rules have a private right of action under the Exchange Act, § 14(a), 15 U.S.C. § 78n(a)." *Kaplan v. First*

*Hartford Corp.*, 447 F. Supp. 2d 3, 7 (D. Mass. 2006) (citing *Royal Bus. Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1059 (1st Cir. 1991)). To state a direct claim for relief under §14(a), a plaintiff need only allege facts satisfying three elements: (1) that the proxy statement contained a material misrepresentation or omission; (2) that the plaintiff was injured by the transaction for which its approval was sought; and (3) that the proxy statement was an essential link in the completion of the transaction. *See Mills*, 396 U.S. at 385. Contrary to Defendants' contention, the Complaint amply alleges all three elements of a direct §14(a) claim.[4]

### 2.      A Direct Claim for Violation of §14(a) Requires No Demand

Defendants contend that §14(a) claims are subject to the "pre-suit demand requirement that applies generally to all derivative claims," and insist that "Plaintiff's failure to make demand is fatal to its claims against the PHC Defendants." Defs.' Mem. at 21.[5] However, Defendants' contention conveniently ignores the distinction between direct and derivative §14(a) claims. It is well established that violations under §14(a) can be direct. *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964); *Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438, 440 (D. Md. 1996) ("Inasmuch as Plaintiff has adequately alleged §14(a) violations, it may bring a direct cause of action under the provision.").

While derivative §14(a) claims are subject to a demand requirement, direct §14(a) claims are not. *See, e.g., Black*, 2011 U.S. Dist. LEXIS 46852, at *6-14 (applying demand requirement

---

[4] Defendants suggest Plaintiff's §14(a) claims are premature because the "Preliminary Proxy Statement filed with the SEC and provided publicly to investors on June 13, 2011 is not the final Proxy Solicitation." Defs.' Mem. at 20. Yet the plain language of Rule 14a-9 draws no distinction between preliminary and final proxies. 17 CFR § 240.14a-9 (No solicitation subject to this regulation shall be made by means of ***any*** proxy statement . . .") (emphasis added). Consistent with this plain language, there are ***many*** cases involving §14(a) claims based on a preliminary proxy. *See e.g.*, *Strategic Turnaround Equity Partners, L.P. v. Fife*, No. 10-CV-11305 (SJM), 2010 U.S. Dist. LEXIS 63629 (E.D. Mich. June 28, 2010) (§14 claim based on preliminary proxy); *New Jersey v. Sprint Corp.*, No. 03-207 (JWL), 2010 U.S. Dist. LEXIS 134003 (D. Kan. Dec. 17, 2010) (same); *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511 (S.D.N.Y. 2008) (same); *Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F. Supp. 1260 (S.D. Fla. 1995) (same).

[5] Citations to "Defs.' Mem." are to the Memorandum in Support of PHC Defendants' Motion to Dismiss the Amended Complaint.

to derivative §14(a) claims but not to direct §14(a) claims). Tellingly, **all** of the cases Defendants cite involved **derivative** claims for violation of §14(a).[6]

The §14(a) claim is thus properly pled as direct, and no demand upon PHC is required.[7]

### 3.    The Proxy Fails to Disclose All Material Information

In *Mills*, the US Supreme Court emphasized that "corporate suffrage is an important right," and stressed Congress's goals of "ensuring full and fair disclosure to shareholders" and promoting "the free exercise of voting rights of stockholders by ensuring that proxies . . . be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." 396 U.S. at 381-82 (quotation omitted). Later, in *TSC Industries, Inc. v. Northway, Inc.*, the Supreme Court affirmed the importance of, and connection between, corporate disclosures and shareholders' voting rights, embracing the notion that "disclosures by corporate management . . . enable the shareholders to make an informed choice." 426 U.S. 438, 448 (1976).[8]

---

[6] *See* Defs.' Mem. at 21 (citing *Lewis v. Graves,* 701 F.2d 245, 247-50 (2d Cir. N.Y. 1983) (dismissing **derivative** §14(a) claim for failure to make demand); *In re Computer Scis. Corp. Derivative Litig.*, No. CV 06-05288 MRP, 2007 U.S. Dist. LEXIS 25414, at *12 (C.D. Cal. Mar. 26, 2007) (same); *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 966 (N.D. Cal. 2007) (same)).

[7] The Complaint alleges that "Plaintiff will be deprived of his right to make a fully informed decision" concerning the merger vote if the misrepresentations and omissions in the Proxy are not corrected. ¶92. Under Massachusetts law, wrongs involving "the right to vote, or to assert majority control" give rise to **direct** claims. *Smyth v. Field*, No. 91-7803-F, 1993 Mass. Super. LEXIS 231, *9 (Mass. Super. Ct. 1993); *In re Columbia Entities Litig.*, No. 04-11704-REK, 2005 U.S. Dist. LEXIS 33439, *14 (D. Mass. Nov. 30, 2005) (a claim qualifies as direct under Massachusetts law where the alleged wrong affects the "right to vote") (citing *Lapidus v. Hecht*, 232 F.3d 679, 683 (9th Cir. 2000)). The same is true under Delaware law. *Calamore*, 2008 U.S. Dist. LEXIS 111356, *10 ("Assuming Plaintiff's allegations are true, the Court finds that she has alleged a deprivation of her right to a fully informed vote. Under Delaware law, such deprivation is an individual harm.").

[8] "The *TSC* materiality standard is an objective one, measured from the point of view of the *reasonable investor*," not "the subjective views of the directors." *Zirn v. VLI Corp.*, 621 A.2d 773, 779 (Del. 1993) (discussing *TSC*, 426 U.S. at 449) (emphasis in original). As such, a material omission is not rendered immaterial simply because the party making the omission believes it is insignificant. Rather, an omitted fact is deemed material when it would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *TSC*, 426 U.S. at 449; *see also Matrixx Initiatives v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (the materiality requirement is satisfied any time there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available") (citation omitted).

As discussed in more detail below, there are numerous allegations that provide the Court with a basis to sustain the Complaint because defendants' disclosure violations were material.

### a.  Defendants Failed to Fully and Fairly Disclose Material Information Concerning the Sales Process for PHC

Plaintiff alleges that Defendants failed to disclose material information concerning the sales process for the Complaint. Defendants do not contest the existence of these omissions and misstatements. Rather, defendants claim that the information was not material. Defendants are simply wrong.

Among other things, Plaintiff alleges that the Proxy did not fully and fairly disclose:

- any of the reasons Shear and Jefferies gave the Board on May 9, 2011 as to why they believed that, outside of Acadia, there was an "absence of other viable candidates for a combination with PHC" (¶ 63);

- a specific per share dollar figure for the value that holders of PHC Class A common stock will be receiving for their PHC Class A shares in connection with the Merger (¶64);

- any qualifications of Defendant Grieco that warranted his appointment by the PHC Board to act as "Lead Independent Director" or why he was appointed to such position (¶66);

- why a Special Committee of the Board was not established to negotiate and/or examine the terms of the Proposed Transaction or to explore strategic alternatives to it or why no independent financial advisor was retained by the Board to participate in negotiations with Acadia (¶67);

- whether PHC's 12 month projections – which the Proxy states PHC's contribution to the combination must take into account "[i]n view of PHC's recent growth and prospects" – were materially different from the forecast disclosed on page 69 of the Proxy (¶69);[9]

- the relative values of PHC and Acadia for purposes of basing the proportion of ownership of the combined post-Merger company as between Acadia and PHC's present shareholders, and who calculated these relative values (¶70); and

---

[9] If the projections referred to on page 51 and the projections referred to on page 69 of the Proxy were materially different, the Proxy needs to disclose the 12 month projections discussed on page 51. ¶69.

- how a $5 million payment to PHC's Class B shareholders was deemed appropriate (¶71).[10]

Defendants object they are not required to give shareholders a "play-by-play" account of the merger process. Defs.' Mem. at 21. But material information about the process that culminated in the merger – particularly given the notable absence of any discussions with any other potential buyers for the Company – is something shareholders must have before submitting their votes. *See Basic*, 485 U.S. at 236; *In re Time Warner Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993); *Texas Partners*, 685 F.2d at 1120; *Blau v. Harrison*, No. 04 C 6592, 2006 U.S. Dist. LEXIS 19795, at **20-21 (N.D. Ill. Mar. 24, 2006). Without full and fair disclosure of this material information about the sales process, shareholders are unable to determine whether the Board adequately pursued all options to get the best deal it could, and the Board's recommendation in favor of the Merger becomes inherently suspect. *See Blau*, 2006 U.S. Dist. LEXIS 19795, at **20-21 (failure to disclose material information about the negotiation process cast doubt on statement in the Proxy that merger was "'fair, from a financial point of view'"); *see also In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 209 (Del. Ch. 2007) (shareholders were entitled to a "a fuller, more balanced description of the board's actions" after the Proxy left shareholders with a false impression that all possible alternatives had been pursued).

---

[10] In addition, page 141 of the Proxy states that "Waud Capital Partners and Acadia will terminate the professional services agreement in connection with consummation of the merger and upon payment of $20,559,000 in aggregate transaction fees to Waud Capital Partners pursuant to the terms of the related termination agreement. Under the merger agreement, $15,559,000 of such transaction fees will be subtracted from the $90.0 million dividend to be made by Acadia to holders of Acadia capital stock immediately prior to consummation of the merger." While hopelessly confusing, the paragraph quoted seems to suggest that Acadia owes Waud $20,559,000, $15,559,000 of which will be subtracted from the $90 million dividend to Acadia shareholders, but it never discusses how the additional $5 million apparently due to be paid from Acadia to Waud Capital is to be paid or what it is for. Indeed, while the prior paragraph (Proxy at 141) states that Acadia, on April 1, 2011, just paid Waud $6.15 million in fees, the Proxy apparently is silent (or obtuse) about the remaining $5 million. ¶65.

Defendants counter that the Proxy contains "extensive" discussion of the background and reasons for the merger. Defs.' Mem. at 23. But such discussion of the sales process imposed a duty upon Defendants to provide full and accurate information about that process to ensure their disclosures were not materially misleading to shareholders. *See Time Warner*, 9 F.3d at 268 ("[W]hen a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration."). Indeed, "'[o]nce defendants travel[] down the road of partial disclosure . . . they . . . [have] an obligation to provide the stockholders with an accurate, full and fair characterization of those historic events.'" *Zirn*, 681 A.2d at 1056. Moreover, Plaintiff disputes Defendants' contention this discussion of the merger process was sufficiently "extensive," which is an issue of fact unsuitable for determination on a motion to dismiss. *See Time Warner*, 9 F.3d at 268 ("Whether consideration of the alternate approach constitutes material information, and whether nondisclosure of the alternate approach renders the original disclosure misleading, remain questions for the trier of fact, and may be resolved by summary judgment when there is no disputed issue of material fact.").[11]

Accordingly, Plaintiff has adequately alleged that defendants violated §14(a) by omitting material information about the sales process employed to sell the Company.

> **b.      Defendants Failed to Fully and Fairly Disclose Material Information Concerning the Fairness Opinion**

Plaintiff alleges that Defendants omitted material information from the Proxy in connection with the fairness opinion. For example:

---

[11] The same flaw infects Defendants' claim the Proxy contains "extensive disclosures" as to Defendants' compensation agreements, equity holdings, and employment agreements. Defs.' Mem. at 23. As described in the Complaint, the Proxy fails to disclose: (a) why the PHC Board granted itself stock options this year in May, as compared to July in previous years; and (b) correct information regarding the options and shareholdings of the Individual Defendants (compare Proxy at p. 78 to pp. 170-71). ¶87.

- "Discounted Cash Flow Method – PHC". The Proxy fails to disclose: (a) the basis for SRR's chosen residual growth rate for PHC of 2.5%-3.5%, including why a higher residual growth rate of 3.0% to 4.0% was used for valuing Acadia, versus the 2.5% to 3.5% residual growth rate used for valuing PHC, and what assumptions were made in determining the residual growth rates;[12] and (b) the risk-free rate, market risk premium, beta, corporate bond rates or any other assumptions made by SRR to determine the "WACC" of 13.5%-14.5% for PHC along with the sources of that information, as well as why a lower WACC was used for Acadia and what assumptions were used to calculate this lower WACC rate for Acadia and the higher 13.5% to 14.5% rate for PHC, and why SRR apparently selected a lower WACC of 10.5% to 11.5% to be used in valuing Acadia (thereby materially increasing the relative value of Acadia vis-à-vis PHC). ¶¶73-77.

- "Guideline Company Method – PHC". The Proxy fails to disclose: (a) what characteristics for each guideline company allowed SRR to determine each such company was similar to PHC for purposes of including them in the analysis (particularly since SRR admitted that none of the selected companies is directly comparable to PHC); (b) while showing the mean observed EV / NFY EBITDA multiple was 7.4x and the mean observed EV / NFY + 1 multiple was 6.9x, it fails to explain why a range higher than the mean of 7.5x to 8.0x was used for the EV / NFY EBITDA multiple while a range lower than the mean of 5.5x to 6.0x was used for the EV / NFY + 1 multiple; and (c) how much weight SSR gave to each multiple to calculate the indicated EV range of $71.2 million to $76.8 million. ¶78.

- "Merger and Acquisition Method – PHC". The Proxy fails to disclose: (a) what selection criteria were used in identifying the listed transactions; and (b) the enterprise value associated with each listed transaction. ¶79.

- "Discounted Cash Flow Method – Acadia". The Proxy: (a) fails to explain why a lower WACC of 11.5% to 12.5% was used for Acadia than the WACC used for PHC (compare Proxy at 60) or disclose all of the assumptions used to calculate the WACC range used for Acadia; and (b) fails to explain why a higher residual growth rate of 3.0% to 4.0% was used for Acadia than the residual growth rate used for PHC (see Proxy at 60) and what assumptions were made to determine the residual growth rate for Acadia. ¶80.

- "Guideline Company Method – Acadia". The Proxy fails to disclose what factors lead SRR to use higher EV / NFY EBITDA and EV / NFY + 1 EBITDA for Acadia than for PHC. (Compare Proxy at 60-61.)   ¶81. Moreover, while SRR listed low, high, mean, and median market multiples under the Guideline Company method for valuing PHC, it did not do so under the Guideline Company Method for valuing Acadia. Rather, the Proxy merely discloses that SRR selected a range of NFY EBITDA multiples of 8.5x to 9.0x and NFY+1 EBITDA multiples of 8.0x to 8.5x,

_____

[12] The selection of the lower residual growth rate for PHC had the effect of reducing the relative value of PHC to that of Acadia for no stated reason. ¶74.

indicating a range of EV for Acadia of approximately $364.8 million to $386.9 million.

- "Merger and Acquisition Method – Acadia". The Proxy fails to explain what factors lead SRR to use a higher range of EV to EBITDA multiples of 8.5x to 9.5x for Acadia than for PHC. (Compare Proxy at 61.) ¶82. By selecting the higher multiples for Acadia and the lower ones for PHC, SRR artificially increased the value of Acadia relative to that of PHC, thereby affecting the apportionment ratio in the surviving company in favor of Acadia, to the detriment of PHC's public shareholders.

- "Discounted Cash Flow Method – Combined Company". The Proxy fails to explain where the combined company's estimated WACC of 10.5% to 11.5% came from and all of the assumptions used by SRR to calculate this WACC range. ¶83.

- "Guideline Company Method – Combined Company". The Proxy fails to disclose what factors lead SRR to use higher EV / NFY EBITDA and EV / NFY + 1 EBITDA for its projection of the combined company than for PHC and Acadia separately. ¶84.

- "Merger and Acquisition Method – Combined Company". The Proxy fails to disclose what factors lead SRR to use an even higher range of EV to EBITDA multiples of 9.0x to 10.0x for the combined company than it used for Acadia and PHC separately. ¶85.

Defendants dismiss these allegations as "overlapping and hyper-technical" and suggest they have no legal obligation to disclose underlying details regarding a financial advisor's fairness opinion. Defs.' Mem. at 22. But it is well-settled that there is no more material information for shareholders in a merger than the information underlying or supporting the purported "fair value" of their shares.[13]

Indeed, Delaware courts have held that simply disclosing "the banker's 'fairness opinion' alone and without more, provides stockholders with nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker." *Pure Res.*, 808 A.2d at 449. Shareholders are also "'entitled to a fair summary of the substantive work performed by the

---

[13] *See, e.g.*, *Lockspeiser v. Western Maryland Co.*, 768 F.2d 558, 561 (4th Cir. 1985); *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1121 (9th Cir. 1982); *In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142, 1149 n.5 (C.D. Cal. 2002); *In re PHLCORP Sec. Tender Offer Litig.*, 700 F. Supp. 1265, 170-72 (S.D.N.Y. 1988); *Radol v. Thomas*, 556 F. Supp. 586, 594 (S.D. Ohio 1983), *aff'd*, 772 F.2d 244 (6th Cir. 1985); *Netsmart*, 924 A.2d at 203; *In re Pure Res. S'holders Litig.*, 808 A.2d 421, 448-50 (Del. Ch. 2002); *Alidina v. Internet.com Corp.*, No. 17235-NC, 2002 Del. Ch. LEXIS 156, at *37 (Del. Ch. Nov. 6, 2002); *In re JCC Holding Co., Inc. S'holder Litig.*, 843 A.2d 713, 722 (Del. Ch. 2003).

investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely.'" *Alidina*, 2002 Del. Ch. LEXIS 156, at *37. Equipping a shareholder with the information necessary to inform a decision as to the adequacy of the merger consideration requires divulging "the underlying data the investment banker relied upon," *id.*, as well as "the basic valuation exercises that [the investment banker] undertook, the key assumptions that they used in performing them, and the range of values that were thereby generated." *Pure Res.*, 808 A.2d at 449.

The *Netsmart* decision is particularly instructive. In that case, the company failed to disclose the projections underlying the discount cash flow analysis conducted by the board's financial advisor. The court held that disclosure of the investment advisor's underlying projections was crucial to the shareholders' decision:

> Faced with the question of whether to accept cash now in exchange for forsaking an interest in Netsmart's future cash flows, Netsmart stockholders would obviously find it important to know what management and the company's financial advisor's best estimate of those future cash flows would be. . . . That is especially the case when most of the key managers seek to remain as executives and will receive options in the company once it goes private. Indeed, projections of this sort are probably among the most highly-prized disclosures by investors.

924 A.2d at 203. When companies tout investment banker opinions, a duty arises to disclose all material facts underlying those opinions so that shareholders can make an informed decision:

> Once a board broaches a topic in its disclosures, a duty attaches to provide information that is "materially complete and unbiased by the omission of material facts." For this reason, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

*Id.* at 202; *see also Pure Resources*, 808 A.2d at 448 (explaining that when disclosure "venture[s] into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts").

12

The significance and specificity of this omitted information concerning SRR's fairness opinion contrasts favorably with the allegations found deficient in the cases cited by Defendants. Defs.' Mem. at 22-23 (citing Delaware cases). In *Skeen v. Jo-Ann Stores, Inc.*, for example, the plaintiff merely alleged the omitted information would be helpful in valuing the company and failed to explain how it would significantly alter the total mix of information already available. 750 A.2d 1170, 1174 (Del. 2000). Here, by contrast, most of the omissions concerning SRR's methodology relate to the decision to use a lower estimated weighted average cost of capital for Acadia than PHC in computing the exchange ratio of PHC shares for Acadia share, which dramatically reduces the proportion of the combined company that PHC's public Class A shareholders would otherwise receive for their shares. ¶73 and n.4. Such information would obviously have a significant impact upon the total mix of information available to PHC shareholders considering the merger.

In *Globis Partners, L.P. v. Plumtree Software, Inc.*, the Delaware Chancery Court rejected a handful of alleged omissions that were so vague and insignificant as to be inactionable. C.A. No. 1577-VCP, 2007 Del. Ch. LEXIS 169, at *50 (Del. Ch. Nov. 30, 2007). But by Defendants' own admission, the allegations at issue in this case are "hyper-technical," Defs.' Mem. at 22, suggesting a level of specificity far beyond those rejected in *Globis*. In *In re CheckFree Corp. S'holders Litig.*, the plaintiff sought disclosure of financial projections that the investment bank never actually relied upon in formulating its fairness opinion. No. 3193-CC, 2007 Del. Ch. LEXIS 148, at *10-11 (Del. Ch. Nov. 1, 2007). Similarly, in *In re Lear Corp. S'holder Litig.*, the plaintiff sought disclosure of the first of eight drafts of a fairness presentation containing a model that was never endorsed as reliable by either senior bank officials or management. 926 A.2d 94 (Del. Ch. 2007). In this case, by contrast, the omitted information pertains to the methodology underlying SRR's actual and final opinion.

13

### c. Defendants Failed to Fully and Fairly Disclose Material Information About Conflicts of Interest with the Company's Financial Advisor

Defendants fail to detail adequately the scope and impact of conflicts with PHC's financial advisor involved in the Proposed Transaction (SRR), which was retained to render an opinion that the merger price is fair to the shareholders, and to perform the valuation analysis necessary to support that opinion.

Courts require that shareholders be apprised of all material information regarding actual and potential conflicts of interest that bear on their financial advisors' ability to perform their work objectively and without being subjectively manipulated to advance the interests of conflicted corporate fiduciaries.[14] Both the fact and the extent of the contingent benefit a financial advisor hopes to gain from a merger transaction must be disclosed.[15] Moreover, shareholders are entitled to know the full extent of the past, current and future employment and fees that the Board's advisors have earned from the party that supposedly stands on the other side of the transaction. *See Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1150-51 (Del. Ch. 2006).[16]

### B. The Complaint Alleges Valid Claims for Breach of Fiduciary Duty

While Defendants are correct that Massachusetts law governs the claims for breach of fiduciary duty (Defs.' Mem. at 6), this hardly renders Delaware law irrelevant. Rather, Massachusetts courts often look to Delaware authorities for guidance, particularly where

---

[14] *See In re Tele-Commc'ns, Inc., S'holders Litig.*, C.A. No. 16470, 2005 Del. Ch. LEXIS 206, at *41 (Del. Ch. Dec. 21, 2005) ("the contingent compensation of the financial advisor . . . creates a serious issue of material fact, as to whether [the advisor] . . . could provide independent advice to the Special Committee"); *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 515 (D.C. Cir. 1986) (holding that shareholders are entitled to disclosure of information regarding a financial advisor's conflicts of interest).

[15] *See La. Mun. Police Employees' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1191 (Del. Ch. 2007) ("where a significant portion of bankers' fees rests upon initial approval of a particular transaction, that condition must be specifically disclosed to the shareholder. Knowledge of such financial incentives on the part of the bankers is material to shareholder deliberations.").

[16] The Proxy is also misleading for not disclosing the fee PHC has agreed to pay Jefferies, or what compensation Jefferies Finance is getting for providing the debt commitment. ¶86.

corporate law is concerned. *See, e.g., Sarin v. Ochsner*, 721 N.E.2d 932, 934 (Mass. App. Ct. 2000) (applying Delaware law to determine whether claims were direct or derivative); *Gent v. Teradyne, Inc.*, 2010 Mass. Super. LEXIS 305, *17-18 (Mass. Super. Ct. 2010) (looking to Delaware cases interpreting a similar statute governing demands for corporate records); *Instrument Indus. Trust v. Danaher Corp*., 2005 Mass. Super. LEXIS 575, *15 (Mass. Super. Ct. 2005) (looking to a "recent Delaware Chancery Court decision" in interpreting agreement governed by Massachusetts law); *Gut*, 2007 Mass. Super. LEXIS 382, at *32-33 (distinguishing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc*., 506 A.2d 173, 182 (Del. 1986)).

## 1.      The Claims Are Properly Pled as Direct

Defendants insist these claims are derivative because the Complaint purportedly fails to allege "any special injury that is 'special and distinct' from all shareholders generally. Defs.' Mem. at 6. But Plaintiff does not simply allege the merger consideration is unfair and Defendants are enriching themselves at the expense of all shareholders equally. Rather, the Complaint describes how the merger will enrich PHC Class B shareholders, while diluting the Class A shares held by Plaintiff. Specifically, Defendants have abused their control of PHC to secure a $5 million premium for Class B shares unavailable to Class A shareholders, who will receive mere ¼ share of Acadia common stock in exchange for each PHC Class A share, affording them only a minority stake (i.e., 22.5%) in the newly formed company. ¶¶ 2, 27-28, 95. Such injuries do not affect all shareholders equally.

More fundamentally, the "rule of corporate recovery for wrongs to the corporation may not be inflexible." *Crowley v. Communications for Hosp., Inc*., 30 Mass. App. Ct. 751, 765 n.17 (Mass. App. Ct. 1991) (citing *Samia v. Central Oil Co.*, 339 Mass. 101, 123 (1959)); *Horton*, 1997 Mass. Super. LEXIS 85, at *64-65 (discussing *Crowley*). The Supreme Judicial Court has held that, where controlling stockholders in a close corporation "freeze out" minority

stockholders by denying them equal purchase rights, the minority has a direct claim for breach of fiduciary duty. *Donahue v. Rodd Electrotype Co. of New England*, 328 N.E.2d 505, 519 and n.25 (Mass. 1975); *Liston v. Gottsegen*, 348 F.3d 294, 301 n.10 (1st Cir. Mass. 2003) (A direct "suit for personal relief is appropriate where it would be difficult to establish a breach of duty owed to the corporation, as in the case of a freeze-out of minority shareholders.") (citing *Donahue*, 328 N.E.2d at 314-15); *Horton*, 1997 Mass. Super. LEXIS 85, at *64 (upholding direct claim for dilution of plaintiff's shares).

Massachusetts courts have not considered whether *Donahue* and its progeny apply to analogous situations outside the close-corporation context. However, the basic principle is the same in cases like this one, where Defendant Shear controls PHC by virtue of his power to elect and replace a majority of the Company's Board of Directors, ¶8, and has abused this control to enrich himself and other Class B shareholders while diluting Class A shares, ¶95. Indeed, the Delaware "Supreme Court has held that when a controlling shareholder extracts financial benefit from the shareholders and procures a financial benefit exclusive to himself, the non-controlling shareholders have a direct claim for breach of fiduciary duty." *Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 130 (Del. Ch. 2007). Such Massachusetts and Delaware cases recognizing a direct claim by minority or non-controlling shareholders are more closely analogous than the general citations offered by Defendants. Defs.' Mem. at 7-8 (citing cases).

### 2.     The Business Judgment Rule Does Not Protect Defendants

Defendants also contend their conduct is presumptively valid pursuant to the business judgment rule. Defs.' Mem. at 11. They claim the Complaint is "devoid of any particularized allegations of fact that, if proven, would overcome the presumptions afforded by that rule." *Id.* at 12. "However, some transactions involve a higher risk of abuse of fiduciary duty and warrant higher judicial scrutiny." *Gut*, 2007 Mass. Super. LEXIS 382, *37 (citing *Coggins*, 397 Mass. at

533). In cases involving "freeze out" mergers and analogous transactions, a "controlling stockholder who is also a director standing on both sides of the transaction bears the burden of showing that the transaction does not violate fiduciary obligations." *Coggins*, 397 Mass. at 533; *Gut*, 2007 Mass. Super. LEXIS 382, at *37 (applying *Coggins* to a "somewhat analogous" case); *Horton*, 1997 Mass. Super. LEXIS 85, *68 (applying *Coggins*).

The merger in dispute, while not technically a freeze out, nevertheless presents an analogous case where the business judgment rule should not apply. The Complaint describes how Defendant Shear "'can establish, maintain and control business policy and decisions by virtue of his control of the election of the majority of the members of the board of directors.'" ¶8 (quoting PHC's Form 10-K filed on September 24, 2010). Plaintiff further alleges Shear and his fellow Defendants have abused this control to enrich Class B shareholders, including themselves, through a $5 million premium unavailable to Class A shareholders, including Plaintiff, who will become mere minority shareholders in the new company that results from the merger. ¶¶ 2, 27-28, 95. Given these risks of self dealing and dilution of Class A shares, "a judge should examine with closest scrutiny the motives and behavior of the controlling stockholder." *Coggins*, 397 Mass. at 533; *Gut*, 2007 Mass. Super. LEXIS 382, at *37; *Horton*, 1997 Mass. Super. LEXIS 85, at *68.

### 3. Defendants Cannot Meet Their Burden of Proving the Merger Was Fair and for a Legitimate Business Purpose

In view of the foregoing, Defendants' attempt to preclude consideration of the Delaware Supreme Court's decision in *Revlon* is a red herring. First, Massachusetts courts have considered Delaware decisions, including *Revlon*, as at least persuasive precedent. *See Gut*, 2007 Mass. Super. LEXIS 382, at *32-33 (distinguishing *Revlon* on factual grounds). Second, even if *Revlon* does not apply, under Massachusetts law, Defendants still "bear the burden of proving, first, that

the merger was for a legitimate business purpose, and, second, that, considering the totality of the circumstances, it was fair" to Class A shareholders. *Coggins,* 424 Mass. at 534-35; *Gut*, 2007 Mass. Super. LEXIS 382, at *37; *Horton*, 1997 Mass. Super. LEXIS 85, at *70. Defendants do not meet these burdens.

Under the merger's terms, Class B shareholders will receive a cash payment of $6.46 per share in addition to receiving the same fractional share of Acadia that the members of the Class receive, while Class A shareholders will receive only ¼ of a share of Acadia, worth, according to the Proxy, $2.50 to $3.31 per share. ¶27. Thus, Class A shareholders will receive $2.50 to $3.31 per share while Class B shareholders will receive $6.46 plus $2.50 to $3.31 per share, for an aggregate consideration of $8.96 to $9.77 per Class B share – more than triple what Class A shareholders receive.[17] ¶28. Most of this $5 million cash premium will go to Defendant Shear, PHC's current Chief Executive Officer, who beneficially owns 93.2% of all Class B shares. Owners of Class A shares like Plaintiff get nothing more than a fractional share of the newly formed company, in which they will be mere minority shareholders.

To meet their burden under Massachusetts law, Defendants must explain why it is fair and in the best interests of the Company for Class B shareholders to receive this $5 million when there is no provision or contractual obligation anywhere entitling them to it in the event of a liquidation or payment of dividend. ¶39. Nor do the Class B shares have any pre-emptive rights and they are non-redeemable by the Company. *Id.* The Class B shares, while having supervoting rights, are not "preferred" securities, and are convertible into Class A common stock on a share-

---

[17] Tellingly, while the Proxy estimates a specific per share dollar figure ($6.46 per share) for the cash consideration that holders of PHC Class B common stock will be receiving for their PHC B shares in connection with the Merger the Proxy fails to estimate a specific per share dollar figure for the value that holders of PHC Class A common stock will be receiving for their PHC Class A shares in connection with the Merger. ¶64.

for-share basis, with no premium attributable to the Class B shares upon conversion. *Id.* The apparent purpose of this premium is to enrich Defendant Shear.

Defendants must also explain why it is fair and in the best interests of the company for Class A shares to be exchanged in the merger for merely ¼ shares of Acadia common stock. Indeed, the Proxy fails to explain the decision to use a lower estimated weighted average cost of capital for Acadia than PHC in computing this exchange ratio, which dramatically reduces the proportion of the combined company that PHC's public Class A shareholders would otherwise receive for their shares. ¶73 and n.4. As a result of the merger, Acadia stockholders will own approximately 77.5% of the combined company, while PHC stockholders will only own approximately 22.5%, making the latter minority shareholders in the combined company. ¶2.

### C.   Plaintiff Is Entitled to Remedies Besides Appraisal

Defendants insist that the sole remedy available to Plaintiff is appraisal pursuant to Mass. Gen. Laws ch. 156D, §13. Defs.' Mem. at 24. As Defendants acknowledge, however, shareholders are ***not*** limited to an appraisal remedy where the merger in dispute is illegal or fraudulent. *Id.* As the preceding sections confirm, the Complaint amply alleges the merger was unlawful under Massachusetts ***and federal law***. Moreover, appraisal would not be a "complete remedy" for Plaintiff's injuries. Defs' Mem. at 25. The fairness of the share price is just one of many serious wrongs alleged. Defendants' misconduct has further deprived Class A shareholders of their right to cast an informed vote regarding the merger, and threatens to dilute their shares in the exchange for fractional shares of Acadia common stock. ¶¶92, 95. Appraisal cannot compensate Plaintiff for such harms.

### D.   The Complaint Alleges Valid Claims for Aiding and Abetting

As the preceding sections confirm, Plaintiff has alleged valid, direct claims for breach of fiduciary duty. Defendants object that the Complaint fails to plead facts showing Acadia knew

of, and substantially assisted, these breaches of fiduciary duties. Def.' Mem. at 26; Acadia Defs.' Renewed Mem. at 2.[18] As stated previously, however, the Complaint specifically alleges that Acadia agreed, among other things, to pay a $5 million premium for PHC Class B shares that served no real purpose other than to enrich Defendant Shear. ¶¶2, 27-28, 95. Plaintiff is entitled to have all facts viewed, and all reasonable inferences drawn, in his favor. *J & J Sports Prods. v. Carvajal*, 2011 U.S. Dist. LEXIS 109542 (D. Mass. Sept. 26, 2011) (citing *Giragosian v. Bettencourt*, 614 F.3d 25, 27 (1st Cir. 2010)). And it is reasonable to infer Acadia knew it was agreeing to pay this premium far in excess of what PHC Class B shares were worth.

Defendants also reiterate their argument that Plaintiff's claims are derivative, not direct. Defs.' Mem. at 26. Here again, however, Defendants' argument misperceives the gravamen of Plaintiff's allegations, which is that Defendants directly injured Plaintiff by abusing their control of the Company to enrich themselves at the expense of Class A shareholders. As Acadia aided and abetted a direct violation, the claims against are logically direct as well.

## III.   CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.

Dated: October 4, 2011                            **WHATLEY DRAKE & KALLAS, LLC**

                                                   /s/ *Patrick J. Sheehan*
                                                   Patrick J. Sheehan
                                                   60 State Street, Seventh Floor
                                                   Boston, MA 02109
                                                   Tel. 617-573-5118
                                                   Fax. 617-573-5090

                                                   **BROWER PIVEN**
                                                     **A Professional Corporation**
                                                   David A.P. Brower
                                                   Brian C. Kerr

---

[18] Citations to "Acadia Defs.' Renewed Mem." are to the Memorandum in Support of Acadia Health Care Company, Inc. and Acadia Merger Sub LLC's Renewed Motion to Dismiss.

488 Madison Avenue, Eighth Floor
New York, NY 10022
Tel. 212-501-9000
Fax. 212-501-0300

*Attorneys for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true copy of all the foregoing documents, filed through the ECF system, will be served electronically through the ECF System on the email-registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those identified as non-registered participants on October 4, 2011.

/s/ Patrick J. Sheehan
Patrick J. Sheehan