# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                       )
MAZ PARTNERS LP,                       )
Individually and on Behalf of          )
Others Similarly Situated,             )
                                       )
                  Plaintiff,           )      Civil Action No.
                                       )        11-11049-PBS
v.                                     )
                                       )
BRUCE SHEAR, et al.,                   )
                                       )
                  Defendants.          )
_____)
```

## MEMORANDUM AND ORDER

September 1, 2016

Saris, C.J.

## INTRODUCTION

In this class action, the plaintiff, MAZ Partners LP (MAZ), alleges in Count I of its second amended complaint that the directors of PHC, Inc. (PHC), breached their fiduciary duty by approving inadequate compensation for Class A shareholders in connection with PHC's merger with Acadia Healthcare, Inc. (Acadia). In Count II, MAZ contends that one director, Bruce Shear, then CEO of PHC, breached his fiduciary duty as PHC's controlling shareholder by negotiating a $5 million sweetener for his Class B shares at the expense of the Class A shareholders. Finally, in Count III, MAZ alleges that Acadia

1

aided and abetted these breaches of fiduciary duty.[1] The
defendants respond the directors were independent and protected
by the deferential business judgment rule, that Shear was not
PHC's controlling shareholder, and that MAZ has provided no
evidence that Acadia knowingly aided and abetted any alleged
breach of the directors' fiduciary duty. The plaintiff moved for
class certification and both parties moved for summary judgment.
The Court held a consolidated hearing on those motions.

After hearing, the Court allowed the plaintiff's motion to
certify a class of all Class A shareholders who voted against
the merger or abstained.[2] The defendants filed a petition for
leave to appeal the Court's class certification order, and the
Court stayed further proceedings—including ruling on the
parties' summary judgment motions—pending the disposition of the
petition for appeal. The First Circuit denied the defendants'

---

[1] MAZ's second amended complaint does not allege a violation of
§ 14(a) of the Securities Exchange Act of 1934 and Securities
and Exchange Commission Rule 14a-9. The claim involving the
preliminary proxy statement brought by plaintiff Blakeslee in a
consolidated case was dismissed without prejudice at an earlier
stage of the proceedings. See In re PHC, Inc. S'holder Litig.,
No. 11-cv-11049, 2012 WL 1195995, at *3 (D. Mass. Mar. 30,
2012). The Court denied MAZ's motion for leave to amend to add a
§ 14(a) claim filed after remand from the First Circuit and the
close of discovery. See Docket No. 176.
[2] MAZ Partners LP v. Shear, No. CV 11-11049-PBS, 2016 WL 183519,
at *8 (D. Mass. Jan. 14, 2016).

petition on June 20, 2016, and this Court lifted the stay.
Docket Nos. 238-39. The Court now addresses the parties' motions
for summary judgment.

The plaintiff's motion for partial summary judgment (Docket
No. 182) and the defendants' motion for summary judgment (Docket
No. 181) are **ALLOWED** in part and **DENIED** in part.

**FACTUAL BACKGROUND**

The facts below are taken from the record, and are
undisputed except where stated.

PHC was a publicly traded behavioral healthcare company
organized under Massachusetts law. MAZ is a partnership that
owned over 100,000 shares of stock in PHC. PHC had two classes
of common stock, Classes A and B. Class B common stock had
enhanced voting rights entitling holders to five votes per
share; holders of Class A common stock were entitled to one vote
per share. PHC's board consisted of six directors. Bruce Shear,
a defendant, served as a director, chairman of the board, and
chief executive officer of PHC. Shear held 93% of PHC's
outstanding Class B shares and approximately 8% of Class A
shares. Combined, Shear exercised approximately 20% of the total
outstanding voting rights for all combined PHC shares. Class A
shareholders elected two out of six board members. Class B
shareholders elected the other four directors. Because Shear

held 93% of the Class B stock, he had the power to elect four
directors to the PHC board.

In January 2011, Shear and Acadia CEO Joey Jacobs began
meeting to discuss a possible merger of the two companies. Shear
served as PHC's main negotiator during this phase. The two
corporations, through Shear and Jacobs, agreed that PHC
shareholders would own 22.5% and Acadia shareholders would own
the remaining 77.5% of the newly merged corporation's stock. To
accomplish this split, each PHC share, both Classes A and B,
would be exchanged for a one-quarter share of the newly merged
Acadia entity. The different classes would disappear. Prior to
the merger, due to relative differences in the corporations'
overall market value, Acadia would issue a $90 million dividend
to its shareholders to effectuate the proper 22.5/77.5
percentage split. Significantly, the Class B shareholders would
receive a pro rata share of an additional $5 million as
consideration for the Class B shareholders' enhanced voting
rights. As the holder of 93% of outstanding Class B shares,
Shear received approximately $4.7 million of the additional
consideration. The remaining seven percent of Class B stock was
held by approximately 300 other PHC shareholders.

On March 22, 2011, Joey Jacobs, Acadia's CEO, signed a
letter of intent (LOI) and sent it to the PHC board. The LOI

contained the major details of the proposed merger. It included:
(1) a prohibition on PHC shopping the offer to other potential
merger partners; (2) a deal termination fee if PHC backed out of
the merger; (3) the 22.5/77.5 percentage stock split; (4) the $5
million payment for Class B shares; (5) a provision that Shear
would select two directors of the newly merged company; and
(6) the $90 million dividend to Acadia shareholders pre-merger.
On March 23, 2011, all the PHC directors entered into voting
agreements to vote all of their shares for the merger and
against any alternative merger proposition. Together, all
directors owned approximately 25% of outstanding PHC voting
shares.

On March 27, 2011, Shear requested that director William
Grieco serve as the lead merger negotiator with the power to
undertake discussions with Acadia, hire a financial advisory
firm, and assist with PHC stockholder communications. Shear
continued to play a lead role in negotiations. Shear had a
longstanding professional relationship with Grieco and had
appointed him to the PHC board. Shear eventually appointed
himself and Grieco to the post-merger director positions in
Acadia.

The PHC board retained Arent Fox to advise it on
transactional matters, Pepper Hamilton LLP to advise it on

issues of Massachusetts corporate law, and Stout Risius Ross,
Inc. (SRR), to provide the board with an opinion on the merger's
overall fairness. SRR determined that the share price for
Class A shareholders was fair, but it did not analyze the
additional $5 million consideration for Class B shareholders or
the $90 million pre-merger dividend. PHC declined to form an
independent committee to evaluate the merger's fairness.

On May 19, 2011, at the PHC board meeting, SRR presented
its opinion that the merger consideration for Class A shares was
fair, and the board voted to recommend the merger to the
shareholders. Shear abstained from the board vote to avoid any
apparent or actual conflict of interest. The other five
directors, none of whom owned any Class B shares, voted to
approve and recommend the merger to the shareholders.

Acadia and PHC signed the merger agreement on May 23, 2011.
On September 27, 2011, PHC disseminated its Final Proxy
Statement to the PHC shareholders that disclosed the following
details of the merger: (1) Shear would receive most of the
additional $5 million consideration as the holder of 93% of
Class B common stock; (2) Shear would serve as the merged
company's executive vice president and a director, and Grieco
would serve as a director; (3) PHC directors' vesting schedule
for share options would be accelerated to avoid forfeiture of

compensation; (4) the directors had entered into voting
agreements to vote their shares for the merger; (5) Acadia
shareholders would receive a pre-merger $90 million dividend;
and (6) the PHC board declined to form a special committee to
evaluate the merger based upon advice of counsel. The full SRR
fairness opinion was attached to the Final Proxy, which was
nearly 500 pages long including attachments.

Merger approval required a two-thirds majority shareholder
vote of (1) Class A voting stock alone, (2) Class B voting stock
alone, and (3) Class A and B voting stock together. The PHC
directors together held approximately 11% of PHC's outstanding
Class A stock and 93.2% of its Class B stock. Together the
directors held a total of 24.8% of PHC's outstanding voting
power. On October 26, 2011, the PHC shareholders voted in favor
of the merger with 88.7% of Class A shares and 99.9% of Class B
shares voting for the merger. On November 1, 2011, the merger
was fully consummated. After the merger, MAZ's PHC shares were
automatically converted to Acadia shares. In January 2012, MAZ
sold all of its Acadia shares at a profit.

## DISCUSSION

### I.   Legal Standard

Summary judgment is appropriate when there is "no genuine
dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed

on a motion for summary judgment, the moving party must

demonstrate that there is an "absence of evidence to support the

nonmoving party's case." <u>Sands v. Ridefilm Corp.</u>, 212 F.3d 657,

661 (1st Cir. 2000) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 325 (1986)). Once such a showing is made, "the burden

shifts to the nonmoving party, who must, with respect to each

issue on which [it] would bear the burden of proof at trial,"

come forward with facts that demonstrate a genuine issue. <u>Borges</u>

<u>ex rel. S.M.B.W. v. Serrano-Isern</u>, 605 F.3d 1, 5 (1st Cir. 2010)

(citing <u>Celotex</u>, 477 U.S. at 324).

"A genuine issue exists where a reasonable jury could

resolve the point in favor of the nonmoving party." <u>Meuser v.</u>

<u>Fed. Express Corp.</u>, 564 F.3d 507, 515 (1st Cir. 2009) (internal

quotation marks omitted). "A party cannot survive summary

judgment simply by articulating conclusions the jury might

imaginably reach; it must point to evidence that would support

those conclusions." <u>Packgen v. BP Expl. & Prod., Inc.</u>, 754 F.3d

61, 67 (1st Cir. 2014). A material fact is "one that has the

potential of affecting the outcome of the case." <u>Calero-Cerezo</u>

<u>v. U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004).

In its review of the evidence, the Court must "examine the

facts in the light most favorable to the nonmoving party," and

draw all reasonable inferences in its favor, to "determine if
there is sufficient evidence favoring the nonmoving party for a
jury to return a verdict for that party." <u>Sands</u>, 212 F.3d at 661
(internal quotation marks omitted). The Court must ignore
"conclusory allegations, improbable inferences, and unsupported
speculation" at the summary judgment stage. <u>Chiang v. Verizon
New England Inc.</u>, 595 F.3d 26, 30 (1st Cir. 2010). "Ultimately,
credibility determinations, the weighing of the evidence, and
the drawing of legitimate inferences from the facts are jury
functions, not those of a judge." <u>Sensing v. Outback Steakhouse
of Fla., LLC</u>, 575 F.3d 145, 163 (1st Cir. 2009) (internal
quotation marks and alteration omitted).

## II.  <u>Defendants' Motion for Summary Judgment</u>

### A. Count I: The Directors' Fiduciary Duty

The defendants argue that, because the directors are
protected by an exculpation provision, they are entitled to
summary judgment on all of MAZ's duty of care claims—including
the claim for material omissions in the Final Proxy—and that the
plaintiff has put forth insufficient evidence that the directors
violated their duty of loyalty. The plaintiff responds that the
stock option acceleration provision, director voting agreements,
Shear and Grieco's post-merger employment, the $5 million
Class B sweetener, and Shear's influence over the merger

negotiations show that the directors failed to act in the best interests of the PHC shareholders in approving the merger.

> i. <u>Disclosure Claims</u>

The defendants argue that PHC's exculpation clause immunizes them from any claim that they violated their duty of disclosure in the Final Proxy. Although the plaintiff failed to amend its complaint to include § 14(a) claims, the plaintiff's second amended complaint included a common law fiduciary duty claim for failure to disclose material information to PHC shareholders. Docket No. 177 at 9. The complaint alleged thirty separate omissions and misrepresentations in the Final Proxy. <u>Id.</u> at 55-64. The plaintiff responds that intentional and reckless violations of the duty of disclosure implicate the duty of loyalty, and therefore, the defendants are not saved by the exculpation clause which applies only to duty of care claims.

In its articles of organization, a Massachusetts corporation may set forth "a provision eliminating or limiting the personal liability of a director to the corporation for monetary damages for breach of fiduciary duty," but the articles may not limit liability for "any breach of the director's duty of loyalty," for "acts or omissions not in good faith or which involve intentional misconduct," or "for any transaction from which the director derived an improper personal benefit." M.G.L.

ch. 156D, § 2.02 (b)(4). PHC's articles of organization

contained the following exculpation clause:

> No director of the Corporation shall be liable to the
> Corporation or its stockholders for monetary damages for
> breach of fiduciary duty as a director, except for
> liability (i) for any breach of the director's duty of
> loyalty . . . or (iv) for any transaction in which the
> director derived an improper personal benefit.

Docket No. 185, Ex. 4 at 16.

Because the defendants are exculpated from all duty of care

claims, this Court must determine whether a director's omission

or misrepresentation in the Final Proxy falls under the duty of

loyalty. See In re Cornerstone Therapeutics Inc. S'holder

Litig., 115 A.3d 1173, 1179 (Del. 2015) ("[P]laintiffs must

plead a non-exculpated claim for breach of fiduciary duty

against an independent director protected by an exculpatory

charter provision, or that director will be entitled to be

dismissed from the suit."); Frank v. Elgamal, No. CIV.A 6120-

VCN, 2014 WL 957550, at *33 (Del. Ch. Mar. 10, 2014) (holding

that "the purported disclosure violations must relate to a

possible duty of loyalty or good faith claim" to survive an

exculpatory provision).

The parties cite extensively to Delaware law. Because of

Delaware courts' expertise in corporate matters, Massachusetts

courts regularly find their decisions persuasive. See, e.g.,

Coggins v. New England Patriots Football Club, Inc., 492 N.E.2d
1112, 1116-17 (Mass. 1986).

The "duty of disclosure is not an independent duty, but
derives from the duties of care and loyalty." Chen v. Howard-
Anderson, 87 A.3d 648, 691 (Del. Ch. 2014) (quoting Pfeffer v.
Redstone, 965 A.2d 676, 684 (Del. 2009)). "Corporate fiduciaries
can breach their duty of disclosure . . . by making a materially
false statement, by omitting a material fact, or by making a
partial disclosure that is materially misleading." Pfeffer, 965
A.2d at 684. To be material, there "must be a substantial
likelihood that the disclosure of the omitted fact would have
been viewed by the reasonable investor as having significantly
altered the total mix of information made available." Malpiede
v. Townson, 780 A.2d 1075, 1086 (Del. 2001) (internal quotation
marks omitted).

Disclosure violations in proxy statements can fall within
the protections of a corporate exculpation clause. See Arnold v.
Soc'y for Sav. Bancorp, Inc., 650 A.2d 1270, 1287 (Del. 1994).
To avoid dismissal based upon an exculpation clause, the
plaintiff must show that the defendants "improperly interfered
with the voting process by knowingly or deliberately failing to
make proper disclosure," or acted "in bad faith and recklessly."
Id. at 1288 (internal alteration omitted); see also Zirn v. VLI

Corp., 681 A.2d 1050, 1061-62 (Del. 1996) (holding that the directors were protected by the corporation's exculpation provision because "any misstatements or omissions that occurred were made in good faith" and the "directors lacked any pecuniary motive to mislead the VLI stockholders intentionally"). "A good faith erroneous judgment as to the proper scope or content of required disclosure implicates the duty of care rather than the duty of loyalty." Zirn, 681 A.2d at 1062.

The plaintiff alleges that the Final Proxy contained numerous material omissions and misrepresentations. Docket No. 177 at 55-64. At the hearing, MAZ highlighted what it considered to be the most egregious violations. Among others, the Final Proxy failed to disclose that, "at the time the Board at Shear's request appointed Defendant Grieco as lead independent director, he had already learned that he was the front runner to receive an Acadia Board seat and had already sent his resume to Acadia . . . ." Docket No. 230 at 24-25. However, in multiple locations, the Final Proxy disclosed Grieco's post-merger Acadia director position. Docket No. 187, Ex. 1 at 23, 91, 115. The plaintiff contended that "the proxy failed to disclose that the Board had no basis whatsoever for saying that the Class B payment was fair to the Class A." Docket No. 230 at 25. Although the Final Proxy did not contain such an explicit disclaimer, the

13

SRR fairness opinion was attached, which stated that SRR had not been asked to address the fairness of "the amount of the Class B Consideration, any distribution paid to Acadia shareholders," or "the amount of the Class A Consideration relative to the Class B consideration." Docket No. 187, Ex. 1 at 394. However, in his deposition, Grieco testified that he believed that SRR had rendered an opinion regarding the "fairness of the transaction to all shareholders, which would have included the Class B." Docket No. 187, Ex. 5 at 29. Finally, the plaintiff argued that the "proxy misleadingly implies that Grieco, as the lead independent director, had been empowered to act on the stockholders' behalf," when in reality, Shear continued to play the lead role in merger negotiations. Docket No. 230 at 26. However, the Final Proxy disclosed Shear's involvement alongside Grieco in numerous activities related to the merger, including reviewing and commenting on the draft merger agreement, meeting with PHC's financial advisors, and updating PHC's board on merger developments. Docket No. 187, Ex. 1 at 62-63.

The plaintiff can only prevail on its disclosure claim if it can show intentional, knowing, or reckless conduct on the part of the directors. The plaintiff has presented evidence from which a jury could find that the defendants failed to fully inform the shareholders that the SRR fairness opinion did not

14

address the $5 million Class B payment or the $90 million pre-merger dividend. The Final Proxy itself was over 200 pages long and over 500 pages long with attachments. What shareholder is going to wade through the proxy and then jump into the attachments? Even Grieco was confused about the scope of the fairness opinion. Still, particularly since the SRR opinion was attached, there is no evidence of intentional, reckless, or bad faith misconduct. At most, the plaintiff's disclosure allegations constitute violations of the duty of care, not the duty of loyalty, and the directors are protected by the exculpation clause for such violations. Therefore, the Court allows the defendants' motion for summary judgment with respect to the directors' liability for any disclosure violations.

   ii. <u>Duty of Loyalty</u>

   The plaintiff argues that because of the stock option acceleration provision, the voting agreements, Grieco and Shear's post-merger employment with Acadia, and the $5 million Class B payment, the directors received improper personal financial benefits as part of the merger at the expense of the PHC shareholders. MAZ also contends that Shear, although he abstained from the merger vote, improperly controlled the other directors' merger votes. The defendants respond that these provisions and agreements are standard for most mergers and are

not separate financial benefits sufficient to show a violation
of the duty of loyalty, and that the directors exercised their
independent business judgment in voting to approve the merger.

In most circumstances, Massachusetts courts defer to the
business judgment of corporate directors. Johnson v. Witkowski,
573 N.E.2d 513, 522 n.22 (Mass. App. Ct. 1991) ("It is no part
of the judicial function to substitute the court's business view
for that of those vested by law with the control of corporate
affairs." (alteration omitted)). The business judgment rule is
"a presumption that in making a business decision the directors
of a corporation acted on an informed basis, in good faith and
in the honest belief that the action taken was in the best
interests of the company." Aronson v. Lewis, 473 A.2d 805, 812
(Del. 1984), overruled on other grounds by Brehm v. Eisner, 746
A.2d 244 (Del. 2000). "Absent an abuse of discretion, that
judgment will be respected by the courts. The burden is on the
party challenging the decision to establish facts rebutting the
presumption." Id.

"To rebut successfully business judgment
presumptions . . . thereby leading to the application of the
entire fairness standard, a plaintiff must normally plead facts
demonstrating that a majority of the director defendants have a
financial interest in the transaction or were dominated or

16

controlled by a materially interested director." <u>Orman v.</u>
<u>Cullman</u>, 794 A.2d 5, 22 (Del. Ch. 2002) (emphasis in original)
(internal quotation marks omitted). "The purpose of the
distinction between interested and disinterested directors is to
ensure that the directors . . . can exercise their business
judgment in the best interests of the corporation, free from
significant contrary personal interests and apart from the
domination and control of those who are alleged to have
participated in wrongdoing." <u>Harhen v. Brown</u>, 730 N.E.2d 859,
864-65 (Mass. 2000).

"There is no bright-line rule for determining whether
additional, merger-related compensation constitutes a disabling
interest." <u>Globis Partners, L.P. v. Plumtree Software, Inc.</u>, No.
1577-VCP, 2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007). The
Court must determine whether the additional compensation is "so
substantial as to have rendered it improbable that the board
could discharge their fiduciary obligations in an even-handed
manner." <u>In re Staples, Inc. S'holders Litig.</u>, 792 A.2d 934, 951
(Del. Ch. 2001) (alteration omitted).

The PHC directors, other than Shear, each owned <u>only</u>
Class A shares of PHC stock so their incentives to maximize the
value of those Class A shares were aligned with the public
shareholders. However, as the holder of 93% of PHC Class B

17

shares, Shear personally benefited from the $5 million sweetener that he negotiated for directly with Acadia's CEO. He also received a $1.5 million change-in-control payment pursuant to the PHC change-in-control executive supplemental benefit plan. In an effort to avoid a conflict, Shear abstained from the merger vote.

The plaintiff first contends that the board of directors received inappropriate compensation because the directors' stock option vesting schedules accelerated. The directors were not issued additional stock options as part of the merger; rather, the acceleration provision applied only to their existing options to avoid forfeiture of those options post-merger. "The accelerated vesting of options does not create a conflict of interest because the interests of the shareholders and directors are aligned in obtaining the highest price." Globis, 2007 WL 4292024, at *8 (finding that the "value of the accelerated option increased incrementally with the acquisition price").

Next, the plaintiff points to voting agreements under which the directors committed to vote their shares for the merger and not solicit other offers. The merger agreement also contained a termination fee if PHC chose to back out of the merger. These provisions are common in merger agreements and do not constitute director interest in the transaction. Deal protection measures

18

such as voting agreements, deal termination fees, no-solicitation clauses, and provisions "limiting the Board's ability to discuss an alternative transaction with an unsolicited bidder," are standard practice in merger agreements and do not make the merger transaction "*a fait accompli*." In re Answers Corp. S'holders Litig., No. CIV.A. 6170-VCN, 2011 WL 1366780, at *4, n.47 (Del. Ch. Apr. 11, 2011).

The plaintiff also highlights the fact that Grieco and Shear secured post-merger director positions on the Acadia board. As the defendants point out, in the context of corporate mergers, officers and directors from the discontinued company often assume positions of leadership in the newly formed corporation. This practice assures some continuity post-merger. This type of post-merger employment is not an inappropriate personal benefit. "[M]anagement's expectation of employment with the new company is not, in itself, sufficient to establish a conflict of interest on the part of the directors." Ehrlich v. Phase Forward Inc., 955 N.E.2d 912, 919 (Mass. App. Ct. 2011). The plaintiff has failed to provide sufficient evidence that a majority of the directors had an improper financial stake in the merger.

The plaintiff's last argument is its strongest. MAZ alleges that the voting directors, even if not financially interested in

the merger, were dominated and controlled by Shear, a materially interested director. With respect to domination of the voting directors by Shear, a "director may be considered beholden to another when the allegedly controlling entity has the unilateral power to decide whether the challenged director continues to receive a benefit, financial or otherwise." In re Sabine, Inc., No. 03-10668-JNF, 2006 WL 1045712, at *6 (Bankr. D. Mass. Feb. 27, 2006). However, "the mere fact that directors were selected, nominated and elected by a particular shareholder has long been rejected as insufficient to establish a director's lack of independence or disinterestedness." Demoulas v. Demoulas Super Markets, Inc., No. 033741BLS, 2004 WL 1895052, at *15 (Mass. Sup. Ct. Aug. 2, 2004). "[A]llegations concerning longstanding business relations fail as a matter of law to place in issue the independence of directors . . . ." Orman, 794 A.2d at 27.

Shear was a hands-on CEO and selected four of six board members. He negotiated directly with Acadia's CEO, outside the supervision of the other board members, for the $5 million Class B payment and his post-merger director position. The directors later approved this payment without asking SRR to independently determine its fairness. Although Shear could not approve the merger himself, he could veto it based on his majority control of the Class B shares. Although in their

affidavits the directors flatly denied any coercion or

intimidation by Shear, the plaintiff has provided sufficient

evidence to create a genuine dispute about whether Shear

controlled the directors' merger votes. Therefore, the

defendants' motion for summary judgment on Count I is denied.

**B. Count II: Shear as Controlling Shareholder**

The plaintiff argues that Shear, as PHC's controlling

shareholder, violated his fiduciary duty by competing with the

public shareholders for merger consideration. The defendants

respond that Shear was not the controlling shareholder and did

not owe any independent fiduciary duty to shareholders outside

of his duty as director.

A "shareholder owes a fiduciary duty only if it owns a

majority interest in or exercises control over the business

affairs of the corporation." Kahn v. Lynch Commc'n Sys., Inc.,

638 A.2d 1110, 1113 (Del. 1994) (emphasis in original) (internal

quotation marks omitted). The Delaware Supreme Court has held:

> A shareholder who owns less than 50% of a corporation's
> outstanding stocks does not, without more, become a
> controlling shareholder of that corporation, with a
> concomitant fiduciary status. For a dominating
> relationship to exist in the absence of controlling
> stock ownership, a plaintiff must allege domination by
> a minority shareholder through actual control of
> corporation conduct.

Id. at 1114 (alteration omitted) (quoting Citron v. Fairchild
Camera & Instrument Corp., 569 A.2d 53, 70 (Del. 1989)). The
"analysis of whether a controlling stockholder exists must take
into account whether the stockholder, as a practical matter,
possesses a combination of stock voting power and managerial
authority that enables him to control the corporation." In re
Cysive, Inc. S'holders Litig., 836 A.2d 531, 553 (Del. Ch.
2003). Showing control at less than 50% stock ownership is
difficult because the controller's power must be "so potent that
independent directors and minority stockholders cannot freely
exercise their judgment, fearing retribution from the
controller." In re PNB Holding Co. S'holders Litig., No. CIV.A.
28-N, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006); see also
In re Crimson Expl. Inc. S'holder Litig., No. CIV.A. 8541-VCP,
2014 WL 5449419, at *16 (Del. Ch. Oct. 24, 2014) (holding that
to find that "a non-majority blockholder was a controlling
stockholder, a plaintiff would have to allege facts to show that
the blockholder actually controlled the board's decision about
the transaction at issue").

"[I]t is clear that there is no absolute percentage of
voting power that is required in order for there to be a finding
that a controlling stockholder exists . . . ." In re PNB, 2006
WL 2403999, at *9; see also Lynch, 638 A.2d at 1115 (finding

that "notwithstanding its 43.3 percent minority shareholder interest, Alcatel did exercise actual control over Lynch by dominating its corporate affairs"); In re Zhongpin Inc. S'holders Litig., No. CV 7393-VCN, 2014 WL 6735457, at *8 (Del. Ch. Nov. 26, 2014) (finding evidence that a 17% shareholder could be controlling sufficient to survive a motion to dismiss), rev'd sub nom. on other grounds by Cornerstone, 115 A.3d 1173; In re KKR Fin. Holdings LLC S'holder Litig., 101 A.3d 980, 991, 995 (Del. Ch. 2014) (finding that a stockholder who "owned less than 1%" of the common shares was not controlling); In re Cysive, 836 A.2d at 535, 552 (finding control where a shareholder and his close "family member subordinates" controlled "about 36% of the voting equity"); In re W. Nat'l Corp. S'holders Litig., No. 15927, 2000 WL 710192, at *25 (Del. Ch. May 22, 2000) (finding a "46 percent shareholder" to be "non-controlling").

In making this factual inquiry into a control relationship, courts look to a number of different factors. The In re Cysive court noted that the minority shareholder was "Chairman and CEO of Cysive, and a hands-on one, to boot . . . involved in all aspects of the company's business, was the company's creator, and has been its inspirational force." 836 A.2d at 552. In Lynch, the court found that the independent directors were

23

"scared to death" of the controlling shareholder and "deferred to [the controller] because of its position as a significant stockholder . . . ." 638 A.2d at 1114-15. In In re Zhongpin, the court relied on the company's 10-K filings which disclosed to the shareholders that the CEO, a 17% shareholder, had "significant influence over our management and affairs and could exercise this influence against your best interests." 2014 WL 6735457, at *7.

Shear was a minority shareholder who controlled approximately twenty percent of PHC's outstanding voting rights. MAZ relies heavily on Shear's ownership of 93% of Class B shares enabling him to select four out of six PHC directors. Although he was unable to approve the merger on his own, he did have the power to veto the merger if he was unsatisfied with the terms based on his almost total control of Class B shares.

Shear was a hands-on CEO and founder who remained active in the management of the company. Starting in January 2011, Shear was the primary player in the merger negotiations. He initially met with Jacobs, Acadia's CEO, and they agreed on the major issues for the eventual merger. Notably, this framework, which the board adopted and the shareholders eventually approved, included the $5 million sweetener for Class B shareholders and Shear's Acadia board seat post-merger. Shear received

approximately $4.7 million of that sweetener. Even after the board appointed Grieco as the "lead independent director," Shear remained actively involved in the negotiations.

In PHC's 2011 10-K filings, PHC disclosed to shareholders that Shear was "in control of the Company since he is entitled to elect and replace a majority of the Board of Directors." Docket No. 187, Ex. 2 at 23. Although this SEC filing does not precisely track the corporate law definition of control, it is evidence that Shear had power over the direction of PHC. However, the defendants emphasize the plaintiff's admission in its second amended complaint, which stated: "The public stockholders of PHC (in the aggregate) owned a majority of PHC voting stock. Control of the corporation was not vested in a single person, entity, or group, but vested in the fluid aggregation of unaffiliated stockholders (except with respect to electing directors which Defendant Shear alone controlled)." Docket No. 177 at 38.

Finally, the defendants argue that MAZ has produced no evidence that Shear actually controlled the board through threats, financial incentives, or other inducements. The PHC directors submitted affidavits in which they denied any undue influence or domination by Shear. For example, Director Douglas Smith stated:

> I always exercised my own independent business judgment
> and consistently strove to faithfully discharge my
> fiduciary obligations to PHC's shareholders. I was never
> threatened, dominated, intimidated, or ordered by Mr.
> Shear or anyone else to follow any course of action, or
> vote in a particular way on any issue—including the
> proposed merger with Acadia.

Docket No. 195, Ex. 5 at 3-4.

However, the defendants' expert Andrew Capitan testified about the merger that: "unless [Shear] wanted to do it, it wouldn't happen. And I think that's a very powerful position from the point of view of if you want to buy this company, you got to make a deal with Mr. Shear." Docket No. 192, Ex. 1 at 31. Additionally, director Robar testified about the $5 million Class B sweetener that "most of it was going to Bruce [Shear], and he was giving up something he had built up his whole life, his company, it was a publicly traded company, but he had controlling interest, and he was giving up his controlling interest in the company, which is huge." Docket No. 192, Ex. 1 at 129. The directors did not ask SRR to perform an independent evaluation of the $5 million Class B payment. Although there is no evidence of direct threats made to the other directors, MAZ has supplied sufficient evidence that Shear controlled the merger negotiations, was a hands-on CEO, and the board deferred to him in his assessment of the merger agreement.

The Court finds that MAZ has provided sufficient evidence

to show a genuine dispute of material fact regarding Shear's status as the controlling shareholder of PHC. The defendants' motion for summary judgment with respect to Count II of the plaintiff's second amended complaint is denied.

### C. Shareholder/Director Ratification

The defendants argue that, even if Shear had a conflict of interest, the merger transaction is valid under Massachusetts law because the shareholders and the disinterested directors voted to ratify the merger. Under Massachusetts law:

> A conflict of interest transaction is a transaction with the corporation in which a director of the corporation has a material direct or indirect interest. A conflict of interest transaction is not voidable by the corporation solely because of the director's interest in the transaction if any one of the following is true:
>> (1) the material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved, or ratified the transaction;
>> (2) the material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved, or ratified the transaction; or
>> (3) the transaction was fair to the corporation.

M.G.L. ch. 156D, § 8.31(a). "The statute makes the automatic rule of voidability inapplicable to transactions that [are] fair to the corporation or that have been approved by directors or shareholders after disclosure of the material facts." Butler v. Moore, No. CIV. 10-10207-FDS, 2015 WL 1409676, at *61 n.76 (D.

Mass. Mar. 26, 2015). The statute's commentary is instructive. "A director who engages in a transaction with the corporation that is not voidable because one or more of the tests of § 8.31 have been met is not thereby automatically protected against a claim of impropriety on his part." M.G.L. ch. 156D, § 8.31 cmt. 1. "The elimination of the automatic rule of voidability does not mean that all transactions that meet one or more of the tests set forth in § 8.31(a) are automatically valid." Id. The typical case involves self-dealing. See Patel v. Emerald P'ship, Ltd., No. CIV.A. 00-1033-H, 2009 WL 1058356, at *1 (Mass. Sup. Ct. Apr. 9, 2009) (involving allegations that the defendant directors "improperly transferred the assets of both corporations" to one of the director defendant's "wholly-owned" companies).

The Court has not found, and the defendants have not cited, any Massachusetts case where a director has used this statute as a shield to liability for a violation of his fiduciary duty of loyalty in the merger context. Delaware courts themselves struggle with the impact of a fully informed shareholder vote on claims against the directors. See Solomon v. Armstrong, 747 A.2d 1098, 1114 (Del. Ch. 1999) ("The legal effect of shareholder ratification, as it relates to alleged breaches of the duty of loyalty, may be one of the most tortured areas of Delaware

law."). The defendants cite <u>In re Santa Fe Pacific Corp.</u>
<u>Shareholder Litigation</u>, for the proposition that in most
circumstances, "where a majority of fully informed stockholders
ratify action of even interested directors, an attack on the
ratified transaction normally must fail." 669 A.2d 59, 68 n.5
(Del. 1995) (internal quotation marks omitted). However, in that
case, because the shareholders voted merely to affirm the merger
in total and not to approve the specific challenged board
conduct at issue in the case, the court "decline[d] to find
ratification . . . ." <u>Id.</u> at 68.

   Assuming without deciding that the Massachusetts statute
does apply to mergers, the plaintiff has provided sufficient
evidence to create a genuine dispute about whether the
shareholder vote was fully informed. Even though the Court has
determined that the directors did not engage in intentional or
reckless violations of their duty of loyalty with respect to the
plaintiff's disclosure allegations, there is a fact question
about whether the directors breached their duty of care by
failing to explicitly disclose in the Final Proxy that the SRR
opinion did not address the fairness of the $5 million sweetener
or the $90 million pre-merger Acadia dividend.

   Moreover, the Court has already ruled that, although the
voting directors were not financially interested in the

transaction, a genuine dispute remains as to whether Shear controlled their merger votes. Therefore, at this stage, there is a dispute of material fact about whether M.G.L. ch. 156D, § 8.31 protects the directors from liability.

### D. <u>Acadia Aiding and Abetting</u>

The defendants argue that MAZ has produced no evidence to support its claim that Acadia knowingly aided and abetted the defendants' breach of fiduciary duty. The plaintiff responds that Acadia's CEO negotiated almost exclusively with Shear and agreed to additional merger compensation for Shear, not shared by the majority of PHC's Class A shareholders.

"[T]he elements of the tort of aiding and abetting a fiduciary breach are: (1) there must be a breach of fiduciary duty, (2) the defendant must know of the breach, and (3) the defendant must actively participate or substantially assist in or encourage the breach to the degree that he or she could not reasonably be held to have acted in good faith." <u>Arcidi v. Nat'l Ass'n of Gov't Emps., Inc.</u>, 856 N.E.2d 167, 174 (Mass. 2006). In <u>In re John Q. Hammons Hotels Inc. Shareholder Litigation</u>, the court denied summary judgment on a similar aiding and abetting claim because the merger buyer had been "intimately involved in the negotiations and structuring of the transaction and understood that [the controlling shareholder] and the minority

30

stockholders were in a sense 'competing' for the consideration
he would pay to acquire" the target company. No. CIV. A. 758-CC,
2009 WL 3165613, at *18 (Del. Ch. Oct. 2, 2009); <u>see also</u> <u>In re</u>
<u>USACafes, L.P. Litig.</u>, 600 A.2d 43, 55-56 (Del. Ch. 1991)
(denying a motion to dismiss on aiding and abetting where the
buyer "offered to pay and the individual defendants agreed to
accept, certain additional payments (approximately $17 million)
that were not offered to the classes").

Here, Shear and Acadia's CEO, Jacobs, began negotiating for
the possible sale of PHC in January 2011. Without any outside
involvement, the two agreed to the $5 million payment for
Class B shares and Shear's post-merger employment with Acadia.
Jacobs signed and submitted the LOI to the PHC board with these
provisions. The plaintiff has provided sufficient evidence to
create a genuine dispute about whether Acadia knowingly aided
and abetted Shear's alleged breach of his fiduciary duty. The
Court denies the defendants' motion for summary judgment on
Count III of the plaintiff's second amended complaint.

**III.** **<u>Plaintiff's Motion for Summary Judgment</u>**

**A. Entire Fairness Review**

The plaintiff argues that, because the directors were
controlled by Shear, a materially interested director and
controlling shareholder, in their merger decisions, this Court

31

should declare that the defendants bear the burden of establishing the entire fairness of the merger.

"Ordinarily, in a challenged transaction involving self-dealing by a controlling shareholder, the substantive legal standard is that of entire fairness, with the burden of persuasion resting upon the defendants." Kahn v. Tremont Corp., 694 A.2d 422, 428 (Del. 1997). To rebut successfully the business judgment presumption, a plaintiff "must normally plead facts demonstrating that a majority of the director defendants . . . were dominated or controlled by a materially interested director." Orman, 794 A.2d at 22 (emphasis in original) (internal quotation marks omitted).

The Court has already found that the defendants are not entitled to summary judgment on the questions of whether Shear was PHC's controlling shareholder and whether he dominated the other directors in their merger votes. Because there is a genuine dispute on these issues, the Court denies the plaintiff's motion for summary judgment to establish the standard of review for the merger transaction.

## B. Defendants' Affirmative Defenses

### i. Immunity

The defendants assert the defense that they are immune from suit under state law for breaches of fiduciary duty under M.G.L.

ch. 156D, § 2.02 (b)(4). As stated in more detail above, based
on the exculpation clause in PHC's articles of organization, the
directors are protected from paying monetary damages for
breaching their duty of care, but not their duty of loyalty.

     ii. <u>Unclean Hands</u>

     The plaintiff argues that the equitable defense of unclean
hands is inapplicable to this action at law for monetary
damages. "Unclean hands is an equitable remedy that allows a
court to refuse to aid one tainted with inequitableness or bad
faith relative to the matter in which he seeks relief, however
improper may have been the behavior of the defendant." <u>Bryan
Corp. v. Chemwerth, Inc.</u>, No. 12-10446, 2013 WL 6489785, at *2
(D. Mass. Dec. 9, 2013) (internal quotation marks omitted). The
defendants put forth no evidence sufficient to overcome summary
judgment on this defense.

     iii. <u>Mitigation</u>

     The plaintiff argues a shareholder has no duty to mitigate
damages in a case alleging a breach of fiduciary duty. The
defendants respond that appraisal is the sole remedy available
to shareholders who are unsatisfied with their share price
merger compensation. However, appraisal is not the sole remedy
"if the corporation attempts an action by deception of
shareholders," and in this situation, "the court's freedom to

intervene or to award damages should be unaffected by the presence or absence of appraisal rights . . . ." M.G.L. ch. 156D, § 13.02 cmt. 3. In a previous opinion written by Judge O'Toole, the Court rejected the defendants' appraisal argument. See In re PHC, Inc. S'holder Litig., No. CIV.A. 11-11049-GAO, 2012 WL 1195995, at *3 (D. Mass. Mar. 30, 2012) (holding that "appraisal is not the exclusive remedy available to the plaintiff[]" where the plaintiff alleges "unlawful conduct of the defendants"). The Court allows summary judgment for the plaintiff on the defendants' affirmative defense of mitigation.

> iv.  Waiver

The defendants assert the defense that the plaintiff waived its disclosure related claims by failing to amend its complaint in light of the Final Proxy. Even though the plaintiff failed to amend its complaint to add § 14(a) allegations, it did properly include a claim based on the common law fiduciary duty to disclose.

> v.  Laches and Estoppel

The plaintiff moved for summary judgment on the defendants' affirmative defenses of laches and estoppel and the defendants failed to oppose. Therefore, summary judgment on these defenses is allowed.

**ORDER**

The Court **ALLOWS** in part and **DENIES** in part the plaintiff's motion for partial summary judgment (Docket No. 182) and the defendants' motion for summary judgment (Docket No. 181).


/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge