—————————————————————————— )
MAZ PARTNERS LP, Individually and )
on Behalf of Others Similarly )
Situated, )
                           )
                Plaintiff, )           Civil Action
                           )      No. 11-11049-PBS
v. )
                           )
BRUCE A. SHEAR, et al., )
                           )
                Defendants. )
—————————————————————————— )

## MEMORANDUM AND ORDER

July 13, 2017

Saris, C.J.

The Court held a nine-day jury trial in this shareholder class action arising from a corporate merger. The Court assumes familiarity with the parties' dispute. See MAZ Partners LP v. Shear, 204 F. Supp. 3d 365 (D. Mass. 2016) (summary judgment order), on reconsideration in part, 218 F. Supp. 3d 132 (D. Mass. 2016).

On March 10, 2017, the jury returned a verdict in favor of Bruce Shear and Acadia Healthcare, Inc. (the "defendants").[1] On the special verdict form, the jury answered:

---

[1] The other defendants were dismissed from the case, leaving only Shear and Acadia by the time the case went to the jury. Trial Tr. Day 8 at 52-53.

1. Has the plaintiff MAZ proven that Bruce Shear controlled a majority of the PHC Board of Directors with regard to the Board's decision to approve the merger?
Yes _X_ No ___

2. Has the defendant Bruce Shear proven that the merger was entirely fair to the Class A shareholders?
Yes ___ No _X_

3. Has MAZ proven that, at the time of the merger, the class suffered an economic loss caused by Shear's breach of fiduciary duty to the Class A shareholders?
Yes ___ No _X_

Docket No. 419. Pursuant to the instructions on the verdict form, the jury stopped after finding no economic loss and did not answer subsequent questions on aiding-and-abetting liability and damages.

Plaintiff MAZ Partners LP ("MAZ") moves for judgment as a matter of law or, in the alternative, for a new trial. MAZ raises a number of issues: (1) alleged inconsistency in the jury verdict, (2) the appropriateness of one of the questions on the special verdict form, (3) the availability of equitable remedies notwithstanding the jury verdict, and (4) evidentiary error at trial. The defendants respond to those issues and also raise three alternative bases for a finding of non-liability.

The Court **ALLOWS** in part the motion for judgment as a matter of law (Docket No. 423). The Court orders that Shear's pro rata share of the $5 million Class B premium be disgorged to the certified class. Otherwise, the Court **DENIES** the motion. The Court **DENIES** the motion for a new trial (Docket No. 426).

## DISCUSSION

## I. Alleged Inconsistency of Jury Verdict

MAZ argues that the jury's answer to Question 3 -- that the class did not suffer an economic loss from Shear's breach of fiduciary duty -- is inconsistent with its determination that Shear was a controlling shareholder and that the merger was not entirely fair to the class. MAZ's objection is untimely, and in any event the jury's verdict was not inconsistent.

### A. Waiver

MAZ failed to timely challenge the jury's special verdict as inconsistent. "[W]ith respect to special verdicts, 'the law is perfectly clear that parties waive any claim of internal inconsistency by failing to object after the verdict is read and before the jury is discharged.'" In re Nexium (Esomeprazole) Antitrust Litig., 842 F.3d 34, 59 (1st Cir. 2016) (quoting Trainor v. HEI Hosp., LLC, 699 F.3d 19, 34 (1st Cir. 2012)). "This has been an 'iron-clad rule' in our circuit." Id. (quoting Rodriguez-Garcia v. Mun. of Caguas, 495 F.3d 1, 9 (1st Cir. 2007)); see also Toucet v. Mar. Overseas Corp., 991 F.2d 5, 8 (1st Cir. 1993) ("In this circuit, a 'party waives inconsistency if it fails to object after the verdict is read and before the jury is dismissed.'" (quoting Bonilla v. Yamaha Motors Corp., 955 F.2d 150, 155-56 (1st Cir. 1992))).

MAZ points to an older First Circuit case suggesting that the Court has discretion to disregard an inconsistent special verdict even in the absence of a timely objection. See Kavanaugh v. Greenlee Tool Co., 944 F.2d 7, 10 (1st Cir. 1991) ("The district court possesses 'considerable discretion' when it comes to the disposition of inconsistent special verdicts . . . . Where, as here, the complaining party, whether tacitly or explicitly, accedes to the written instructions on the special verdict form and to the companion directions included in the charge to the jury, and interposes no objection to the jury's inconsistent responses until after the jury has been discharged, the district court may exercise its discretion to reject special verdicts which the court, with the agreement of all parties, correctly instructed the jury not to answer."). But the question in Kavanaugh was whether to disregard the jury's answers to certain questions on the special verdict form that both parties agreed should not have been answered given the jury's answers to earlier questions on the form. MAZ is not asking the Court to disregard an answer to a question that the jury was instructed not to answer. MAZ's inconsistency challenge is untimely.

**B. Consistency of Verdict**

In any event, the jury verdict was not inconsistent. The jury could have concluded that the premium paid to the Class B shareholders for their high-vote stock was too large but that

there was no resulting economic loss to the Class A shareholders. That conclusion was supported by testimony of the defendants' expert Andrew Capitman:

> Well, one of the things that I disagree greatly with [plaintiff's expert] Mr. Morris about is simply this idea that if you weren't getting the -- if the Class Bs were not getting the premium, the buyer would have paid more for the Class As, and generally speaking, I don't see any evidence for that. I don't see any facts that would support that. But just as a matter of practicality and sort of how cheap and flinty-eyed anybody is when they're a buyer in one of these big executive positions, they don't have to pay it. They're offering a fair price for A. That's in and of itself enough. That they've got to get the Bs to come along with the deal and they've got to negotiate a deal for that, that's a separate issue. So just like you've got to pay for lawyers and accountants and bankers, this is a cost of the deal, but it's not a valuation issue.

Trial Tr. Day 8 at 94. Capitman reiterated that point in response to a juror question:

> A JUROR: So if the B deal wasn't done -- is this what you're saying -- if the B deal was not done, the price of the A shares would not have changed?

> THE WITNESS: Yes, that's what I'm saying. What I'm saying is that from the point of view of assessing the fairness of the deal, the question is, were the A shareholders getting paid a fair price for their PHC stock?

> A JUROR: I guess my question is, would the A shares' stock price have changed if the B deal -- is there a potential for that to have happened if the B deal wasn't made?

> THE WITNESS: I see no evidence that there was any discussion like that.

Trial Tr. Day 8 at 94-95. There was adequate evidentiary support for the jury's conclusion that even if the $5 million premium

for Class B shares was too high (or that no premium should have been paid at all), there was no resulting economic loss to the Class A shareholders because the Class A shareholders would not have gotten a higher price but for the Class B premium.

In fact, the jury was instructed that the entire fairness standard was made up of two components: fair dealing and fair price. Although the Court instructed that the price was the "paramount issue," a sufficiently great finding of unfair process may lead to the conclusion that the merger was not entirely fair to the Class A shareholders even without evidence of unfair price. The relevant part of the jury instructions, which were not objected to, stated:

> The entire fairness standard involves an inquiry into two interrelated concepts: fair dealing and fair price. To determine whether the merger was a product of fair dealing, you may consider when the transaction was timed, how it was initiated, how it was structured, how it was negotiated, how it was disclosed to the directors, and how the approvals of the directors and stockholders were obtained. . . . The fair dealing and fair price components are not viewed in isolation. Rather, you should consider both concepts in conjunction to determine whether the merger was entirely fair to PHC's Class A shareholders. The paramount issue, however, is whether the exchange ratio -- you've heard about this during the testimony -- whether the exchange ratio, the additional consideration to Class B shareholders, and the $90 million pre-merger dividend to Acadia shareholders were fair to the Class A shareholders.

Trial Tr. Day 9 at 26-27; see also Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983); Emerald Partners v. Berlin, 787 A.2d 85, 97 (Del. 2001); In re Crimson Expl. Inc. Stockholder Litig.,

No. CIV.A. 8541-VCP, 2014 WL 5449419, at *9 (Del. Ch. Oct. 24, 2014); In re TD Banknorth, 938 A.2d 654, 667 (Del. Ch. 2007) ("[F]air price and fair dealing are not viewed in isolation, but rather in conjunction, and . . . fairness as to one prong will not necessarily sterilize a transaction or immunize a defendant from liability."). The jury verdict can be supported by a finding that Shear negotiated the Class B premium in an unfair way by seeking personal benefit and not involving the other directors in the negotiation, even if that did not result in an unfair price to the Class A shareholders. The jury verdict was not inconsistent.

## II.  **Question 3 on Verdict Form**

MAZ argues that the Court's inclusion of Question 3 on the verdict form was error because there is no separate causation element necessary to establish a fiduciary duty claim against a controlling shareholder. MAZ failed to timely object to Question 3, and in any event the inclusion of Question 3 on the verdict form was not error.

### A.  **Waiver**

Under Federal Rule of Civil Procedure 51(b)(2), the Court must inform the parties of its proposed instructions and "must give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and arguments are delivered." A party may make a timely objection by "object[ing]

at the opportunity provided under Rule 51(b)(2)." Fed. R. Civ.
P. 51(c)(2)(A). If the party was not informed of an instruction
before the opportunity provided under Rule 51(b)(2), the party
must "object[] promptly after learning that the
instruction . . . has been given." The First Circuit has adhered
to a "strict enforcement of the object-or-forfeit rule." Booker
v. Mass. Dep't of Pub. Health, 612 F.3d 34, 40-41 (1st Cir.
2010).

On February 14, 2017, the Court distributed an initial
draft verdict form to the parties via email. Question 9 on the
draft verdict form asked: "Has MAZ proven that the class has
suffered an economic loss as a result of the Defendants' breach
of fiduciary duties and/or aiding and abetting of breach of
fiduciary duties?" At the final pretrial conference the
following day, MAZ stated: "Your Honor, we actually thought you
understood the law very well. We thought this is a very simple
way and simple for the jury. Now, obviously to some degree the
devil is in the details of the jury instructions, but we think
this makes sense. . . . [W]e don't have any serious opposition
to this. We think it's simple, it's the right interpretation of
the law, and we don't have any strong objection to it, but,
again, it kind of depends on what the jury instructions say."
Docket No. 374 at 78-79.

On March 8, 2017, the seventh day of trial, the Court distributed to the parties a revised draft verdict form and draft jury instructions. Trial Tr. Day 7 at 7–8. Although the draft verdict form had been significantly shortened since the February pretrial conference because of the intervening decision in Int'l Bhd. of Elec. Workers Local No. 129 Benefit Fund v. Tucci, 70 N.E.3d 918 (Mass. 2017), the economic loss question remained substantially intact. Question 3 on that draft of the verdict form asked, "Has MAZ proven that the class has suffered an economic loss caused by Shear's breach of fiduciary duty?" That afternoon, the Court held a charge conference during which MAZ did not object to the inclusion of the economic loss question or to the accompanying jury instruction. MAZ did make a minor objection to the wording of the question, and the Court responded: "So how would you word it? I do have to charge on causation." MAZ responded, "I understand," and proposed that the word "has" in "has suffered" be stricken. The Court adopted that one-word edit. Trial Tr. Day 7 at 156.

On March 9, 2017, the eighth day of trial, the Court distributed to the parties a revised draft verdict form and revised draft jury instructions that incorporated the parties' requests from the prior day's charge conference. Trial Tr. Day 8 at 80. Later that day, following the close of evidence, the Court stated: "as far as I'm concerned, the verdict form is set

at this point because I can't change it at the last minute, and I will hand that out to the jury beforehand. So if there are any problems with it, you need to shoot me an email by, say, 4:00 o'clock." Trial Tr. Day 8 at 134. The parties raised some issues at the time, but none related to the economic loss question. Trial Tr. Day 8 at 134-40. The parties also emailed the clerk before the 4:00 PM deadline with additional issues related to the jury charge, but none of the emails related to the economic loss question.

On March 10, 2017, the ninth day of trial, the Court handed out the special verdict form to the jury and charged the jury. MAZ did not object to Question 3 or the associated jury instruction. Following the jury charge and the closing arguments, the Court held a final sidebar conference before sending the jury to deliberate. Trial Tr. Day 9 at 108. The Court stated: "If it's just preserving an objection for the record, let me do it after I send the jury back; but if it's something that I misstated or some other such issue, you know, like that one instruction, that kind of thing." Trial Tr. Day 9 at 108. MAZ still did not challenge the question on economic loss.

Only after the jury was excused, MAZ stated: "Your Honor, from the verdict form, we would object to the inclusion of the question with respect to economic loss, which is No. 3. We would

10

also object to the -- and we would on that one ask that the question be removed from the charge." Trial Tr. Day 9 at 110. This was the first time MAZ asked that the economic loss question not be submitted to the jury, and even at that time, MAZ did not state a justification. The Court responded: "Can I just say, this is a little unfair. This was not raised the other day, to my memory. . . . It's, you know, the reason I do charge conferences. Then I allowed you to do emails to me yesterday. This is just a surprise, and I think it's waived. I mean, no one has asked me for anything else. This was almost the standard -- I've had this out there now for about four days. So, anyway, you can object, but I don't think it's been fairly preserved." Trial Tr. Day 9 at 110-11.

MAZ did not adequately preserve its objection to Question 3 on the special verdict form by raising it for the first time after the jury commenced deliberation. The Court had given MAZ notice even before the final pretrial conference that the jury was going to be asked about economic loss, and MAZ had many opportunities to object to the question. Even when MAZ did raise the objection for the first time after the jury commenced its deliberation, MAZ did not articulate its reason for seeking to eliminate Question 3.

## B.   Causation and Breach of Fiduciary Duty

In any event, the Court did not err in asking the jury to determine economic loss. Under Massachusetts law, a plaintiff must prove causation to recover damages for breach of fiduciary duty. Qestec, Inc. v. Krummenacker, 367 F. Supp. 2d 89, 97 (D. Mass. 2005) (citing Hanover Ins. Co. v. Sutton, 705 N.E.2d 279, 288–89 (Mass. App. Ct. 1999)) (listing four elements for a breach of fiduciary duty claim: duty, breach, damage, and causation); see also Billings v. GTFM, LLC, 867 N.E.2d 714, 719 (Mass. 2007) ("On the question whether the defendants had breached their fiduciary duty to [the plaintiff] . . . , the [trial] judge concluded that, even if the defendants had breached their fiduciary duty in this regard, [the plaintiff] had failed adequately to prove his damages. . . . Accordingly, as the burden of proving damage was on [the plaintiff], he could recover nothing on this claim even if there had in fact been a breach of duty."). Even if the jury found breach of fiduciary duty, MAZ was not entitled to a compensatory damage award without a finding of resulting economic loss.

But equitable relief may be available without a showing of causation. Massachusetts courts have recognized the availability of equitable remedies as relief for breach of fiduciary duty. See Berish v. Bornstein, 770 N.E.2d 961, 978 (Mass. 2002); Demoulas v. Demoulas, 703 N.E.2d 1149, 1169 (Mass. 1998);

12

<u>Demoulas v. Demoulas Super Markets, Inc.</u>, 677 N.E.2d 159, 195 (Mass. 1997). Those equitable remedies may be awarded without a showing of damage and causation. <u>See</u> <u>Kelley v. CVS Pharmacy, Inc.</u>, No. CIV.A. 98-0897-BLS2, 2007 WL 2781163, at *13 (Mass. Super. Ct. Aug. 24, 2007) ("[I]f an attorney breached his fiduciary duty by investing funds entrusted to him by a client in the attorney's personal hedge fund rather than a client IOLTA account, doubled the money through this investment, and returned the client's principal to the IOLTA account, the law does not permit the attorney to keep the fruits of his breach of fiduciary duty simply because the client is not ultimately injured. Rather, the attorney would be required to disgorge the profits arising from his fiduciary breach to the client. The essential principle is that the law does not wish a fiduciary to enjoy personal financial gain from his breach of fiduciary duty."); <u>see also</u> <u>Fid. Mgmt. & Research Co. v. Ostrander</u>, No. 902142B, 1993 WL 818684, at *4 (Mass. Super. Dec. 9, 1993) ("Since [the defendant] breached the fiduciary duty of undivided loyalty she owed to [the plaintiff], the appropriate remedy is disgorgement of her improper profits. . . . It is of no import whether or not the plaintiffs in this case suffered any measurable monetary damages. The injury to [the plaintiff] is the loss of [the defendant]'s undivided loyalty, and disgorgement of profits is the appropriate remedy to prevent

conflicts of interest in the future."), aff'd, 662 N.E.2d 699

(Mass. App. Ct. 1996). Indeed, "the well-considered position of

every jurisdiction that has considered the issue [of whether

claims for breach of fiduciary duty require actual harm] . . .

is to require harm only for damages, not for the equitable

remedy of disgorgement." Huber v. Taylor, 469 F.3d 67, 77 (3d

Cir. 2006) (citing Liberty Mut. Ins. Co. v. Gardere & Wynne,

L.L.P., 82 F. App'x 116, 118 (5th Cir. 2003)).

The jury's function was only to determine whether damages

should be awarded.[2] Whether equitable relief should be awarded

was for the Court to decide, and the Court deferred that

question until after the jury trial. Docket No. 374 at 40 ("As I

understand rescission generally, it's an equitable remedy. It's

something I decide, not a jury. . . . I'm not going to give the

---

[2]     "Actions for breach of fiduciary duty, historically
speaking, are almost uniformly actions 'in equity' -- carrying
with them no right to trial by jury." Ed Peters Jewelry Co. v. C
& J Jewelry Co., 215 F.3d 182, 186 (1st Cir. 2000) (quoting In
re Evangelist, 760 F.2d 27, 29 (1st Cir. 1985)). But that same
court went on to say, "We point out that this case does not
involve the computation of damages, which is often considered a
determination to be made by a jury." Id. Indeed, "actual and
punitive damages . . . is the traditional form of relief offered
in the courts of law," Curtis v. Loether, 415 U.S. 189, 196
(1974), and the nature of the relief sought is key to
determining whether there is a jury right, Granfinanciera, S.A.
v. Nordberg, 492 U.S. 33, 42 (1989). As such, the claim for
damages for breach of fiduciary duty was properly submitted to
the jury. See Pereira v. Farace, 413 F.3d 330, 340 (2d Cir.
2005) (finding right to jury trial for claim for compensatory
damages for breach of fiduciary duty); FleetBoston Fin. Corp. v.
Alt, 668 F. Supp. 2d 274, 276 (D. Mass. 2009) (same).

jury this issue. I'm going to decide it afterwards. I'm going to give them the legal damage standard -- I'm still not sure what that is -- but not the rescissory. I'll listen to the testimony, and I'll make a decision afterwards as to whether or not it's an appropriate remedy."). The parties agreed to this arrangement, which is the appropriate way for a court to handle a situation where both legal and equitable forms of relief are sought for a single claim. 9 Wright & Miller, Federal Practice and Procedure § 2306 (3d ed.) ("[T]he constitutionally required solution in the situations in which a single issue may be either legal or equitable depending upon the remedy awarded is to have a jury present to decide the issue, even though the district court then may have to determine for itself, on the basis of the jury's determination, whether to grant relief of a type that was historically viewed as equitable."). Given that the jury's role was only to determine whether legal damages should be awarded, the jury was correctly instructed that it need go no further if it did not find economic loss caused by the breach of fiduciary duty.

MAZ argues that causation can be presumed in a controlling stockholder case, even for purposes of a legal damages remedy. The case law does not support that position. First, MAZ argues that there is no mention of causation as a separate element to a fiduciary duty claim in two Massachusetts cases discussing the

fiduciary duty of a controlling shareholder in a corporate merger: Coggins v. New England Patriots Football Club, Inc., 492 N.E.2d 1112 (Mass. 1986), and Gut v. MacDonough, No. CIV.A. 2007-1083-C, 2007 WL 2410131 (Mass. Super. Ct. Aug. 14, 2007). But the remedy sought in Coggins was rescission, and the remedy sought in Gut was a preliminary injunction. That neither of those equitable remedies required a showing of damages and causation is not determinative of whether such a showing is necessary for obtaining damages. Second, MAZ cites language from two Delaware cases that it reads as eliminating a causation requirement for obtaining damages for a breach of fiduciary duty by a controlling shareholder. However, Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 367–71 (Del. 1993), says only that there was no requirement to prove resultant injury in order to show liability for breach of fiduciary duty for purposes of obtaining an equitable remedy. As for In re Orchard Enterprises, Inc. Stockholder Litig., 88 A.3d 1, 53 (Del. Ch. 2014), MAZ points to a cryptic statement that the Delaware Chancery Court made without citation: "In a controlling stockholder case like this one, those issues are subsumed within the entire fairness test." By "those issues," the court seemed to be referring to "causation and damages," but MAZ misreads the case. The statement comes from a paragraph explaining that in a case concerning a breach of the duty of disclosure in a merger, an

injunction requiring corrective disclosures does not require a showing of damages and causation. Id. But the same paragraph stated that claims for post-closure money damages do require a showing of damages and causation. Id. There is no support in the case law for a rule that damages for breach of fiduciary duty by a controlling shareholder can be obtained without a showing of harm or causation. Question 3 on the special verdict form correctly asked the jury to determine causation.

### III. **Equitable Relief**

MAZ seeks two forms of equitable relief: (1) disgorgement of Shear's $4.7 million pro rata portion of the Class B payment, plus prejudgment interest, and (2) rescissory damages as necessary to reform the 22.5%/77.5% equity split in the merger to the split that the Court determines is fair.

Under Massachusetts law, "[e]quitable remedies are flexible tools to be applied with the focus on fairness and justice. A court has the power to grant equitable relief when there has been a violation of fiduciary duty and fraud, and rescission may be ordered to avoid unjust enrichment of the fiduciary at the expense of a beneficiary. A court may also reform an agreement to correct wrongdoing." Demoulas, 703 N.E.2d at 1169.

While equitable relief is within the equitable power of the Court, the Court is bound by the jury's determination on any issues the jury decided relating to the legal remedy. See Wright

& Miller, _supra_, § 2306; _see also_ Int'l Fin. Servs. Corp. v.

Chromas Techs. Canada, Inc., 356 F.3d 731, 735 (7th Cir. 2004)

("Even when a plaintiff is entitled to a jury trial on his legal

claims, the district court must nonetheless make an independent

judgment as to any equitable issue. This proposition is true

even though the jury's determination of factual issues common to

both the legal and equitable claims would bind the court.");

Perdoni Bros. v. Concrete Sys., Inc., 35 F.3d 1, 5 (1st Cir.

1994) ("[W]hen a party has a right to a jury trial on an issue

involved in a legal claim, the judge is of course bound by the

jury's determination of that issue as it affects his disposition

of an accompanying equitable claim." (quoting Lincoln v. Bd. of

Regents of Univ. Sys. of Ga., 697 F.2d 928, 934 (11th Cir.

1983))).

By answering "yes" to the first question on the special

verdict form, the jury determined that Shear was a controlling

shareholder. That determination is binding on the Court. Because

Shear was a controlling shareholder who engaged in a self-

interested transaction that was to the detriment of the

disinterested shareholders, he owed a fiduciary duty to the

adversely affected shareholders. See Tucci, 70 N.E.3d at 926;

Coggins, 492 N.E.2d at 1118. To determine whether that fiduciary

duty was breached, the question is whether Shear could show that

the merger was entirely fair to the Class A shareholders.
Coggins, 492 N.E.2d at 1117.

At trial, MAZ presented two theories as to why the
transaction was not entirely fair: first, because the Class B
premium was too large, and second, because the equity split for
the PHC shareholders was unfair. The jury's answers on the
special verdict form are consistent if the jury agreed with the
first theory but then determined that the Class A shareholders
suffered no injury from the unfairly high Class B premium. There
does not seem to be (and the parties do not suggest) a way that
the jury verdict can be squared with liability under MAZ's
second theory that the Acadia/PHC equity split was also unfair
and therefore a breach of fiduciary duty. If Shear had breached
his fiduciary duty by obtaining an unfair equity split, then the
Class A shareholders must have suffered economic loss because
the Class A merger consideration was directly tied to the equity
split. The Court would reach this same conclusion independently
of the jury verdict. Shear breached his fiduciary duty as a
controlling shareholder because the Class B premium was not
entirely fair to the Class A shareholders, but MAZ failed to
prove that the 22.5% equity share for PHC was also a breach of
fiduciary duty.

As a result of the foregoing, there is no basis for
rescission to reform the equity split. The facts presented at

trial do justify disgorgement of Shear's $4.7 million pro rata portion of the Class B premium. See Berish, 770 N.E.2d at 978 ("The measure of recovery for a wilful breach of fiduciary duty that results in personal financial gain to the trustee may include disgorgement of the amount of the gain."); see also Demoulas, 677 N.E.2d at 197 ("Where a corporate fiduciary obtains a gain or advantage through a violation of his duty of loyalty, a court may properly order restitution of the gain, so as to deny any profit to the wrongdoer and prevent his unjust enrichment.").

The Court calculates the disgorgement remedy as follows. The Class B shareholders received a $5 million premium. While that premium was too high, the payment of a premium was not altogether wrongful. Matthew Morris, the expert for MAZ, testified about a report that Evercore wrote for Xerox about premiums for high-vote share classes. Trial Tr. Day 7 at 95. The Evercore report found thirty transactions in which a company with two classes of shares was acquired. Id. at 96. In twenty-three of those transactions, zero premium was paid to the high-vote shares. Id. In the seven transactions in which a premium was paid, the premium ranged from 1.1 to 5.2 percent of the equity value of the company before the transaction, with an average of around 3.2 percent. Id. at 97. Morris calculated that 3.2 percent of PHC's market capitalization at the time of the

merger was about $1.82 million. Id. at 98. In other words, MAZ's own expert suggested that a $1.82 million Class B premium may have been defensible. The difference between that and $5 million -- $3.18 million -- was unjustified. According to the final proxy statement, Shear owned 721,259 shares of Class B common stock. Docket No. 187-1 at 183. As of the record date, there were 773,717 shares of Class B common stock outstanding. Docket No. 187-1 at 12. That means Shear held 93.22% of the Class B common stock. Shear's pro rata portion of the unjustified portion of the Class B premium, which is the sum that should be disgorged, is 93.22% of $3.18 million, or $2,964,396.

There remains an additional question: to whom that sum is disgorged. Disgorgement of that sum to MAZ and the class it represents would be a windfall, since Shear breached his fiduciary duty to all of the Class A shareholders but MAZ represents only 29.2%[3] of the public Class A shareholders. Docket No. 326 at 11. But to only disgorge 29.2% of Shear's ill-gotten gains would be insufficient to deprive Shear of the fruits of his wrongdoing and to deter future wrongdoing. The First Circuit has recognized the equitable principle that it is "more

---

[3]    MAZ represents "all Class A shareholders who voted against the merger or abstained," Docket No. 234 at 3, which includes both Class A shareholders that affirmatively abstained and those who did not vote at all, Docket Nos. 325, 367, 374 at 62. Those voters constituted 29.2% of the Class A shareholders. Trial Ex. 18 (SEC Form 8-K reporting shareholder vote).

appropriate to give the defrauded party the benefit even of
windfalls than to let the fraudulent party keep them." <u>Lawton v.
Nyman</u>, 327 F.3d 30, 45 (1st Cir. 2003) (quoting <u>Janigan v.
Taylor</u>, 344 F.2d 781, 786 (1st Cir. 1965)). That principle
applies more broadly than the fraud context, as the Restatement
(Third) of Restitution and Unjust Enrichment has recognized the
same principle:

> When the defendant has acted in conscious disregard of
> the claimant's rights, the whole of the resulting gain
> is treated as unjust enrichment, even though the
> defendant's gain may exceed both (i) the measurable
> injury to the claimant, and (ii) the reasonable value of
> a license authorizing the defendant's conduct.
> Restitution from a conscious wrongdoer may therefore
> yield a recovery that is profitable to the claimant --
> a result that is generally not permitted when the
> restitution claim is against an innocent recipient.
> Restitution requires full disgorgement of profit by a
> conscious wrongdoer, not just because of the moral
> judgment implicit in the rule of this section, but
> because any lesser liability would provide an inadequate
> incentive to lawful behavior.

Restatement (Third) of Restitution and Unjust Enrichment § 3
cmt. c (2011). The Restatement expressly recognizes that
principle as a remedy for the breach of fiduciary duty. <u>See id.</u>
§ 43 cmt. c ("Gain resulting from breach of fiduciary duty is a
prime example of the unjust enrichment that the law of
restitution condemns, and one function of the rule of this
section is to exclude the possibility of profit from this kind
of wrongdoing. An equally fundamental goal of liability under
§ 43, and one which may be stated without reference to unjust

22

enrichment, is to enforce by prophylaxis the special duties of the fiduciary. Restitution offers a further safeguard, beyond the fiduciary's liability to make good any injury, protecting the reliance of the beneficiary on the fiduciary's disinterested conduct. To this end, a liability in restitution by the rule of this section does not depend on proof either that the claimant has sustained quantifiable economic injury or that the defendant has earned a net profit from the transaction."). In short, there have been other cases in which disgorgement would result in greater recovery to the plaintiff than the amount of injury that it actually suffered. That in itself is not an extraordinary situation that makes disgorgement inequitable.[4]

To be fair, the windfall concern in this case is slightly different from that of an ordinary case of disgorgement. The windfall arises not simply from the fact that the wrongdoer's profit was higher than the amount of the loss, but that the wrongdoer's profit is being disgorged to only a portion of the persons who were wronged. The parties do not cite a case addressing this situation. However, since the certified class of

---

[4]     Disgorgement may be inequitable in some cases where the plaintiff seeks "unduly remote" profits derived from a wrong. Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(a), 53(3) (2011). The classic example is if valuable artwork were painted on stolen canvas using stolen paint -- disgorgement of the full value of the artwork may be considered inequitable. There is no such concern here.

Class A shareholders who voted against or abstained from voting on the merger did the work in proving the breach of fiduciary duty, it is not unjust to disgorge to them the wrongful gain. See The Little Red Hen, https://en.wikipedia.org/wiki/The_Little _Red_Hen. The Court finds that in this situation, it would be equitable to order the disgorgement of $2,964,396 to MAZ and the certified class that it represents.

MAZ asks for interest on the disgorgement amount. In determining the equitable remedy, the Court is not bound by the state statutory interest rate for tort damage awards in Mass. Gen. Laws ch. 231, § 6B. The Court finds that it would be equitable to award interest at the one-year Treasury bill rate, compounded annually, running from the date of the merger to the date of this order.

Finally, awarding equitable relief is not unconstitutional additur, as the defendants claim. "[T]he Seventh Amendment flatly prohibits federal courts from augmenting jury verdicts by additur." Campos-Orrego v. Rivera, 175 F.3d 89, 97 (1st Cir. 1999). But awarding equitable relief based on the facts as found by the jury does not implicate the Seventh Amendment.

## IV. Prejudicial Evidence Concerning Post-Merger Stock Performance

MAZ argues, in the alternative, that a new trial is warranted on the basis of prejudicial evidence and argument concerning Acadia's post-merger stock performance.

Under Federal Rule of Civil Procedure 61, "Unless justice requires otherwise, no error in admitting or excluding evidence -- or any other error by the court or a party -- is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." See Granfield v. CSX Transp., Inc., 597 F.3d 474, 488 (1st Cir. 2010) (citing Soto Lebrón v. Fed. Express Corp., 538 F.3d 45, 65 (1st Cir. 2008)).

MAZ filed a motion in limine to exclude any reference to Acadia's post-merger stock price performance. Docket No. 315. The Court allowed in part and denied in part the motion in limine. The Court ruled that evidence of post-merger stock price performance is admissible to the extent that the evidence demonstrates why the PHC board opted to negotiate for a larger percentage of the equity in the resulting company. But the Court ruled that the defendants could not make a "no harm, no foul"

argument that MAZ did not suffer an injury because of the rise in the stock price. Docket No. 374 at 68-70.

MAZ's argument for a new trial can be parsed into two parts. First, MAZ argues that the Court's ruling on the motion in limine was erroneous. Second, MAZ argues that at trial, the defendants did not comply with the Court's ruling that they could not make a "no harm, no foul" argument.

MAZ's first argument is adequately preserved. "When a court makes a definitive ruling on a motion in limine, a party need not renew the objection at the time the evidence is offered." United States v. Carpenter, 494 F.3d 13, 18 (1st Cir. 2007). But there was no error. Post-merger financial data can be admissible "to show that plans in effect at the time of the merger have born fruition." Gonsalves v. Straight Arrow Publishers, Inc., 701 A.2d 357, 362 (Del. 1997); see also Cede & Co. v. Technicolor, Inc., 758 A.2d 485, 499 & n.91 (Del. 2000). Post-merger stock performance is relevant to showing the reasonableness of the PHC directors' beliefs and actions in approving the merger, which counters the claim for breach of fiduciary duty. While the probative value of the evidence must be discounted given its post-merger nature, the evidence had particular relevance because MAZ was not only challenging the wisdom of the stock-for-stock merger, but also the structure of the merger. The evidence at trial showed that PHC was a small

public company that had not achieved significant growth in many years. In the merger negotiations, the PHC board sought to structure the transaction in a way that maximized the PHC shareholders' equity stake in the combined company, by agreeing to a $90 million pre-merger dividend to the Acadia shareholders. The post-merger stock performance had some probative value in showing the reasonableness of the PHC directors' decision to negotiate for more equity. To the extent that evidence of post-merger stock performance had prejudicial potential, the Court's ruling on the motion in limine alleviated the concern by preventing the defendants from arguing that there was "no harm, no foul" to MAZ because of the post-merger increase in the stock price.

MAZ's second argument is not adequately preserved. MAZ did not make any contemporaneous objections at trial when, it now alleges, the defendants did not comply with the line the Court drew. In any event, the Court finds that the defendants complied with the line by avoiding any "no harm, no foul" argument. No limiting instruction was necessary, and none was requested -- in fact, when the Court offered to bring the jury back for a limiting instruction, MAZ declined. Trial Tr. Day 9 at 116–18.

## V.   **Defendants' Alternative Arguments**

The defendants raise three alternative arguments supporting a verdict in their favor: the Tucci decision from the Supreme

Judicial Court, insufficiency of evidence on control of a majority of directors, and statutory ratification. None have merit, but they are adequately preserved for appeal.

## A.   Tucci

The defendants argue that judgment should have been entered as a matter of law based on International Bhd. of Elec. Workers Local No. 129 Benefit Fund v. Tucci, 70 N.E.3d 918 (2017), a case that the Supreme Judicial Court decided in the midst of trial. Tucci held that merger challenges are necessarily derivative, with "at least two exceptions" -- one of which allowed direct shareholder merger challenges "where a controlling shareholder who also is a director proposes and implements a self-interested transaction that is to the detriment of minority shareholders." 476 Mass. at 562.

The defendants argue that the exception applies only to majority controlling shareholders and that because there was no majority controlling shareholder in this case, this action had to be brought derivatively. While the Tucci decision used language referring to director-majority shareholders, the decision should not be read as defining controlling shareholders as only those that hold majority shares. Delaware law has consistently recognized that actions by a controlling or dominating shareholder can be subject to the same level of scrutiny as those of a majority shareholder. Kahn v. Lynch

<u>Commc'n Sys., Inc.</u>, 638 A.2d 1110, 1113 (Del. 1994) (citing

<u>Ivanhoe Partners v. Newmont Mining Corp., Del. Supr.</u>, 535 A.2d

1334, 1344 (1987)). Even though Massachusetts corporate law is

not the same as Delaware corporate law in important respects,

<u>see, e.g.</u>, <u>Tucci</u>, 476 Mass. at 563 n.14, the Court does not read

<u>Tucci</u> or <u>Coggins</u> as restricting controlling shareholders in

Massachusetts to those that own majority shares. The parties

agree that no Massachusetts case has decided whether minority

shareholders that dominate or control a majority of the board

can be considered controlling shareholders, and the Supreme

Judicial Court may one day depart from the Delaware courts and

decide the answer is "no." In the absence of any such indication

from the Massachusetts courts, the better approach is to follow

Delaware's rule that domination or control can create a

fiduciary duty as a controlling shareholder. <u>See</u> <u>Piemonte v. New</u>

<u>Boston Garden Corp.</u>, 387 N.E.2d 1145, 1150 (Mass. 1979)

(describing Delaware corporate law as "instructive but not

binding").

**B.    Sufficiency of Evidence on Control**

The defendants argue that there was insufficient evidence

of Shear's control of a majority of the board of directors. They

point out, correctly, that Shear's power to appoint a majority

of the directors does not, without more, establish control. <u>See</u>

<u>In re Primedia Inc. Derivative Litig.</u>, 910 A.2d 248, 258 (Del.

Ch. 2006); <u>Williamson v. Cox Commc'ns, Inc.</u>, No. CIV.A. 1663-N,
2006 WL 1586375, at *4 (Del. Ch. June 5, 2006). But the
defendants incorrectly argue that there is no evidence of "more"
control necessary to establish liability. In particular, the
defendants point out that there was little evidence directly
referring to many of the individual defendants.

There was sufficient evidence of control. Even without
evidence pertaining specifically to each individual director,
MAZ presented evidence that Shear was intimately involved in the
operations of the company from its very beginning. The various
emails to and from Shear during the course of the merger
negotiations showed that Shear controlled the entire negotiation
process, with little involvement from most of the other members
of the board. <u>See</u> <u>MAZ</u>, 204 F. Supp. 3d at 376.

## C.  **Shareholder Ratification**

The defendants argue for shareholder ratification under
Mass. Gen. Laws. ch. 156D, § 8.31. The Court previously held, in
its order on the defendants' motion for partial reconsideration
of the summary judgment order, that the statute does not apply.
Docket No. 302 at 16-21.

As the Court stated, § 8.31 applies to "conflict of
interest transactions." A conflict of interest transaction is
defined as "a transaction with the corporation in which a

director of the corporation has a material direct or indirect interest." Mass. Gen. Laws ch. 156D, § 8.31(a).

A director has an indirect interest in a transaction if either "another entity in which he has a material financial interest or in which he is a general partner is a party to the transaction" or "another entity of which he is a director, officer, or trustee or in which he holds another position is a party to the transaction and the transaction is or should be considered by the board of directors of the corporation." Id. § 8.31(b). Although the statute does not define a direct interest, it can be inferred from the definition of indirect interest that a direct interest is where the director himself or herself is a party to the transaction. None of the directors in this case had a direct or indirect interest in this transaction because they were not, in any way, on the other side of the transaction from PHC.

## ORDER

The Court **ALLOWS** in part the motion for judgment as a matter of law (Docket No. 423) to the extent that $2,964,396 plus interest is disgorged from Shear to the certified class. The Court otherwise **DENIES** the motion. The Court **DENIES** the motion for a new trial (Docket No. 426).

The parties shall submit a proposed form of judgment within fourteen days.

/s/ PATTI B. SARIS
_____
Patti B. Saris
Chief United States District Judge